WEBER ET AL. *v.* ANHEUSER-BUSCH, INC.

No. 97. Argued February 2–3, 1955.—Decided March 28, 1955.

*Robert A. Roessel* argued the cause for petitioners. With him on the brief was *Plato E. Papps.*

*David E. Feller* argued the cause for the Congress of Industrial Organizations, as *amicus curiae,* urging reversal. With him on the brief was *Arthur J. Goldberg.*

*Mark D. Eagleton* argued the cause and filed a brief for respondent.

*Solicitor General Sobeloff, George J. Bott, David P. Findling* and *Dominick L. Manoli* filed a brief for the National Labor Relations Board, as *amicus curiae,* urging reversal.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This case grew out of a dispute between petitioner, the International Association of Machinists (IAM), affiliated with the American Federation of Labor, and the Millwrights, affiliated with the United Brotherhood of Carpenters and Joiners (Carpenters), which in turn was affiliated with the American Federation of Labor, over millwright work being performed for respondent, each union claiming the work for its own members.

Respondent is engaged in the interstate manufacture and sale of beer and other commodities, with its principal place of business in St. Louis, Missouri. Its employees include members of both the IAM and the Carpenters. Respondent has always required a large amount of millwright work to be performed by outside contractors in the expansion of its facilities. After the IAM was certi-

fied in 1948 by the National Labor Relations Board as the exclusive bargaining representative of respondent's machinists, respondent executed a collective bargaining contract with the IAM for 1949 which provided in part that when the repair or replacement of machinery was necessary, this work would be given only to those contractors who had collective agreements with the IAM. As a result of protests from the Carpenters, who claimed the same type of work for their own members, the clause was deleted from the 1950 contract between respondent and the IAM, but it was later reinstated in the 1951 contract. The Carpenters again protested, this time threatening that they would sign no contract with respondent covering those employees who were members of the Carpenters until the clause was deleted from the IAM contract. When the 1951 IAM contract expired and negotiations for a 1952 contract began, respondent refused to agree to the insertion of the clause in the new contract. An impasse was reached in the negotiations, and finally the IAM went on strike.

At the time the strike was called, only one contractor was actually engaged in respondent's millwright work, and the employees of that one contractor were covered by a contract with the IAM.

On April 8, 1952, the day after the strike was called, respondent filed a charge of an unfair labor practice under § 8 (b)(4)(D) of the Taft-Hartley Act against the IAM.[1]

On November 18, 1952, the National Labor Relations Board quashed the notice of a hearing, holding that no "dispute" existed within the meaning of the invoked subsection. The Board reasoned that at the time of the strike, the IAM could not have been requesting the assignment of "particular" work to IAM members, because the IAM was not complaining about the assignment

---

[1] 61 Stat. 140, 29 U. S. C. § 158 (b)(4)(D). The subsection is quoted in footnote 2, *infra*.

of work by respondent to its own employees, and as to work assigned by respondent's contractors, (1) the IAM had made no demand on those contractors to give their work to IAM labor, and (2) no millwright work performed by respondent's contractors at that time was in fact being performed by other than IAM labor. *District No. 9, International Association of Machinists,* 101 N. L. R. B. 346.

It must be emphasized that the only unfair labor practice charge filed with the Board, and the only one upon which the Board acted, was that prescribed in Subsection (D) of § 8 (b)(4).

In the meantime, on April 19, 1952, after it had filed the charge with the Board but before the Board had acted upon it, respondent sought an injunction against the IAM in the State Circuit Court in St. Louis. In its complaint, respondent alleged that the strike constituted "a secondary boycott under the common law of the State of Missouri," and also was in violation of Subsections (A), (B) and (D) of § 8 (b)(4) of the Taft-Hartley Act [2] and

---

[2] "It shall be an unfair labor practice for a labor organization or its agents—

.        .        .        .        .

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; (B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9; . . . (D) forcing or requiring any employer to assign particular work to employees in a particular labor organiza-

of § 303 (a)(1), (2) and (4) of that same Act.[3] A temporary injunction issued. On April 30, respondent amended its complaint with the additional claim that the IAM's conduct constituted an illegal conspiracy in restraint of

tion or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work . . . ." 61 Stat. 140, 29 U. S. C. § 158 (b)(4)(A), (B) and (D).

[3] "(a) It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is—

"(1) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;

"(2) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9 of the National Labor Relations Act;

.         .          .          .          .

"(4) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class unless such employer is failing to conform to an order or certification of the National Labor Relations Board determining the bargaining representative for employees performing such work. . . ." 61 Stat. 158, 29 U. S. C. § 187 (a)(1), (2) and (4).

In view of the questions involving unfair labor practices and protected activity which are present in this case, it is not necessary to discuss the possible effect on state jurisdiction of § 303 (a)(1), (2) and (4).

trade under Missouri common law and conspiracy statutes. Mo. Rev. Stat., 1949, § 416.010. The temporary injunction was thereupon made permanent on September 30, 1952, some time before the Board, it will be recalled, held that there was no violation of § 8 (b)(4)(D) of the Taft-Hartley Act. This injunction was vacated, but immediately re-entered, on October 3, 1952.

The IAM appealed to the Missouri Supreme Court from the Circuit Court's injunction. That court affirmed the permanent injunction on February 8, 1954, more than a year after the Board found no violation of § 8 (b)(4)(D).

The Missouri Supreme Court held that the IAM's conduct constituted a violation of the State's restraint of trade statute and as such was enjoinable. It referred to the ruling of the Board as a determination that "no labor dispute existed between these parties and that no unfair labor practices were there involved, and the Board, upon such ruling, quashed the notice of the hearing." The court then stated: "The cases relied on by the defendants [the IAM] are largely cases involving existing labor disputes and unfair labor practices. We think those cases are not in point." The court concluded: "A jurisdictional quarrel between two rival labor unions is not a labor dispute within the Norris-LaGuardia Act, . . . the Wagner Act or the Taft-Hartley Act." 364 Mo. 573, 584, 586, 265 S. W. 2d 325, 332, 333. The State Supreme Court thus treated the Board's holding as a determination that the allegation on which the injunction issued excluded the basis for a charge of an unfair labor practice under the Taft-Hartley Act.

The principal question that the case raises, whether the state court had jurisdiction to enjoin the IAM's conduct or whether its jurisdiction had been pre-empted by the authority vested in the National Labor Relations Board, has an importance in the federal-state relations regarding

industrial controversies that led us to grant certiorari. 348 U. S. 808.

The Court has had numerous occasions to deal with this delicate problem of the interplay between state and federal jurisdiction touching labor relations. It is helpful to a consideration of this latest phase briefly to summarize where our decisions, under both the Wagner Act and the Taft-Hartley Act, have brought us.

1. The Court has ruled that a State may not prohibit the exercise of rights which the federal Acts protect. Thus, in *Hill* v. *Florida,* 325 U. S. 538, the State enjoined a labor union from functioning until it had complied with certain statutory requirements. The injunction was invalidated on the ground that the Wagner Act included a "federally established right to collective bargaining" with which the injunction conflicted. *International Union* v. *O'Brien,* 339 U. S. 454, involved the strike-vote provisions of a state act which prohibited the calling of a strike until a specific statutory procedure had been followed. The state act was held to conflict not only with the procedure and other requirements of the Taft-Hartley strike provisions but also with the protection afforded by § 7 of that Act.[4] In *Amalgamated Association* v. *Wisconsin Employment Relations Board,* 340 U. S. 383, the state court issued an injunction under a statute which made it a misdemeanor to interrupt by strike any essential public utility services. It was held that the state statute was invalid in that it denied a right

_____

[4] Section 7 provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a)(3)." 61 Stat. 140, 29 U. S. C. § 157.

which Congress had guaranteed under § 7 of the Taft-Hartley Act—the right to strike peacefully to enforce union demands for wages, hours and working conditions. Last Term the Court noted in *Garner* v. *Teamsters Union*, 346 U. S. 485, 499, that

> "The detailed prescription of a procedure for restraint of specified types of picketing would seem to imply that other picketing is to be free of other methods and sources of restraint. For the policy of the national Labor Management Relations Act is not to condemn all picketing but only that ascertained by its prescribed processes to fall within its prohibitions. Otherwise, it is implicit in the Act that the public interest is served by freedom of labor to use the weapon of picketing. For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits."

2. A State may not enjoin under its own labor statute conduct which has been made an "unfair labor practice" under the federal statutes. Such was the holding in the *Garner* case, *supra*. The Court pointed out that exclusive primary jurisdiction to pass on the union's picketing is delegated by the Taft-Hartley Act to the National Labor Relations Board. See also *Plankinton Packing Co.* v. *Wisconsin Employment Relations Board,* 338 U. S. 953; *Building Trades Council* v. *Kinard Construction Co.,* 346 U. S. 933. And in *Capital Service, Inc.* v. *Labor Board,* 347 U. S. 501, a picket line established at retail stores to induce the organization of a manufacturer's employees was enjoined by the State as contrary to its public policy.[5]

---

[5] The complaint in the state court charged the defendant unions with engaging in "an unlawful conspiracy combination and agreement, contrary to the common law of the State of California and contrary to the provisions of the Cartwright Act (Stats. 1907, p. 1835,

This Court granted a limited certiorari which assumed that exclusive jurisdiction over the subject matter was in the National Labor Relations Board.[6] The Board was allowed to obtain an injunction against enforcement of the conflicting state court injunction.

3. The federal Board's machinery for dealing with certification problems also carries implications of exclusiveness. Thus, a State may not certify a union as the collective bargaining agent for employees where the federal Board, if called upon, would use its own certification procedure. *La Crosse Telephone Corp.* v. *Wisconsin Employment Relations Board,* 336 U. S. 18. The same result is reached even if the federal Board has refused certification, if the employer is subject to the Board's jurisdiction. *Bethlehem Steel Co.* v. *New York State Labor Relations Board,* 330 U. S. 767.

4. On the other hand, in the following cases the authority which the State exercised was found not to have been exclusively absorbed by the federal enactments.

---

Ch. 530), now constituting Chapter 2 of Part 2, Division 7, of the Business and Professions Code, sections 16720, et seq., to create and carry out restrictions in trade and commerce and to prevent competition in manufacturing, making, transporting, selling and purchasing of bakery products as hereinafter set forth." The state court, however, reasoned that primary picketing was as much a combination in restraint of trade as secondary picketing, and primary picketing had been held legal by numerous state decisions. The court instead enjoined the conduct on the ground that "secondary picketing is contrary to the public policy of this state. . . ." *Capital Service, Inc.* v. *Bakery Drivers Local Union,* Civil No. 595892, Superior Court of California for the County of Los Angeles.

[6] The Court granted certiorari limited to the following question, propounded by the Court: "In view of the fact that exclusive jurisdiction over the subject matter was in the National Labor Relations Board (*Garner* v. *Teamsters Union,* 346 U. S. 485), could the Federal District Court, on application of the Board, enjoin Petitioners from enforcing an injunction already obtained from the State Court?" 346 U. S. 936.

In *Allen-Bradley Local* v. *Wisconsin Employment Relations Board,* 315 U. S. 740, the State was allowed to enjoin mass picketing, threats of bodily injury and property damage to employees, obstruction of streets and public roads, the blocking of entrance to and egress from a factory, and the picketing of employees' homes. The Court held that such conduct was not subject to regulation by the federal Board, either by prohibition or by protection.

*International Union* v. *Wisconsin Employment Relations Board,* 336 U. S. 245, involved recurrent, unannounced work stoppages. The Court upheld the state injunction on the ground that such conduct was neither prohibited nor protected by the Taft-Hartley Act and thus was open to state control.

The Court allowed a State to forbid enforcement of a maintenance-of-membership clause in a contract between employer and union in *Algoma Plywood & Veneer Co.* v. *Wisconsin Employment Relations Board,* 336 U. S. 301. Since nothing in the Wagner or Taft-Hartley Acts sanctioned or forbade these clauses, they were left to regulation by the State.

Finally, *United Construction Workers* v. *Laburnum Construction Corp.,* 347 U. S. 656, was an action for damages based on violent conduct, which the state court found to be a common-law tort. While assuming that an unfair labor practice under the Taft-Hartley Act was involved, this Court sustained the state judgment on the theory that there was no compensatory relief under the federal Act and no federal administrative relief with which the state remedy conflicted.

We come, then, to the facts in this case.

Contrary to the assumption of the Missouri Supreme Court, the Board had not ruled that no unfair labor practice was involved in the conduct by the IAM of which respondent complained. The Board had determined only that there was no violation of Subsection (D) of § 8 (b)

478

(4). That was, in fact, the extent of the ruling it was empowered to make, because (D) was the only subsection alleged to have been violated. In its complaint in the state court, however, respondent broadened its allegations to include violations of Subsections (A) and (B).

We do not mean to pass on the question whether the Board, by finding that no violation of (D) was involved, inferentially ruled that other subsections were or were not violated. The point is rather that the Board, and not the state court, is empowered to pass upon such issues in the first instance. If a ruling on (D) necessarily encompassed a ruling on the other subsections, we would have a different case. But the ruling on (D) was based on the finding that no "particular work" was involved— a phrase of (D) that is absent in (A) and (B). Congress has lodged in the Board responsibility for determining in the first instance whether the same considerations apply to (A) or (B) as apply to (D).

Nor is it within our competence now to determine whether the conduct in controversy is subject to the authority of Subsections (A) or (B). Under the Board's decisions, for example, it may become pertinent whether this is eventually deemed primary pressure, directed at respondent to force insertion of the disputed clause in its contract with the IAM, rather than secondary pressure, aimed at subcontractors to force them to use IAM labor.[7] We are not now ruling on that distinction. However, the point is pertinent to our discussion, because even if it were clear that no unfair labor practices were involved, it would not necessarily follow that the State was free to issue its injunction. If this conduct does not fall within the prohibitions of § 8 of the Taft-Hartley Act, it may fall

[7] Cf., *e. g.*, *Reilly Cartage Co.*, 110 N. L. R. B., No. 233; *Oil Workers International Union*, 84 N. L. R. B. 315; *International Brotherhood of Teamsters*, 84 N. L. R. B. 360, rev'd *sub nom. International Rice Milling Co.* v. *Labor Board*, 183 F. 2d 21, rev'd 341 U. S. 665.

within the protection of § 7, as concerted activity for the purpose of mutual aid or protection.

Respondent itself alleged that the union conduct it was seeking to stop came within the prohibitions of the federal Act, and yet it disregarded the Board and obtained relief from a state court. It is perfectly clear that had respondent gone first to a federal court instead of the state court, the federal court would have declined jurisdiction, at least as to the unfair labor practices, on the ground that exclusive primary jurisdiction was in the Board.[8] As pointed out in the *Garner* case, 346 U. S., at 491, the same considerations apply to the state courts.

The Missouri Supreme Court oversimplified the factual situation when it called this merely a "jurisdictional quarrel between two rival labor unions." A jurisdictional dispute and a secondary boycott are not necessarily mutually exclusive, as respondent itself showed by alleging, *inter alia,* that this was a secondary boycott prohibited by Missouri common law. Even the Board has not always been consistent in its interpretations of the various subsections of § 8 (b)(4).

Respondent argues that Missouri is not prohibiting the IAM's conduct for any reason having to do with labor relations but rather because that conduct is in contravention of a state law which deals generally with restraint of trade. It distinguishes *Garner* on the ground that there the State and Congress were both attempting to regulate labor relations as such.

We do not think this distinction is decisive. In *Garner* the emphasis was not on two conflicting labor statutes but rather on two similar remedies, one state and one federal, brought to bear on precisely the same conduct.

---

[8] See, *e. g., Amazon Cotton Mill Co.* v. *Textile Workers Union,* 167 F. 2d 183, 188–190; *Bakery & Confectionery Workers' International Union* v. *National Biscuit Co.,* 177 F. 2d 684; see also *Garner* v. *Teamsters Union,* 346 U. S. 485, 491.

480

And in *Capital Service, Inc.* v. *Labor Board, supra,* we did not stop to inquire just what category of "public policy" the union's conduct allegedly violated. Our approach was emphasized in *United Construction Workers* v. *Laburnum Construction Corp., supra,* where the violent conduct was reached by a remedy having no parallel in, and not in conflict with, any remedy afforded by the federal Act.

Moreover, we must not forget that this case is not clearly one of "unfair labor practices." Certainly if the conduct is eventually found by the National Labor Relations Board to be *protected* by the Taft-Hartley Act, the State cannot be heard to say that it is enjoining that conduct for reasons other than those having to do with labor relations. In *Amalgamated Association* v. *Wisconsin Employment Relations Board, supra,* the statute was directed at the preservation of public utility services and not at maintenance of sound labor relations, but the State's injunction was reversed. Controlling and therefore superseding federal power cannot be curtailed by the State even though the ground of intervention be different than that on which federal supremacy has been exercised.

By the Taft-Hartley Act, Congress did not exhaust the full sweep of legislative power over industrial relations given by the Commerce Clause. Congress formulated a code whereby it outlawed some aspects of labor activities and left others free for the operation of economic forces. As to both categories, the areas that have been pre-empted by federal authority and thereby withdrawn from state power are not susceptible of delimitation by fixed metes and bounds. Obvious conflict, actual or potential, leads to easy judicial exclusion of state action. Such was the situation in *Garner* v. *Teamsters Union, supra.* But as the opinion in that case recalled, the Labor Management Relations Act "leaves much to the states, though Congress has refrained from telling us how much." 346 U. S., at 488. This penumbral area can be rendered progressively

clear only by the course of litigation. Regarding the conduct here in controversy, Congress has sufficiently expressed its purpose to bring it within federal oversight and to exclude state prohibition, even though that with which the federal law is concerned as a matter of labor relations be related by the State to the more inclusive area of restraint of trade.

We realize that it is not easy for a state court to decide, merely on the basis of a complaint and answer, whether the subject matter is the concern exclusively of the federal Board and withdrawn from the State. This is particularly true in a case like this where the rulings of the Board are not wholly consistent on the meaning of the sections outlawing "unfair labor practices," and where the area of free "concerted activities" has not been clearly bounded. But where the moving party itself alleges unfair labor practices, where the facts reasonably bring the controversy within the sections prohibiting these practices, and where the conduct, if not prohibited by the federal Act, may be reasonably deemed to come within the protection afforded by that Act, the state court must decline jurisdiction in deference to the tribunal which Congress has selected for determining such issues in the first instance.[9]

The state decree granting the permanent injunction found that "Defendants' [IAM's] picket line was so placed and maintained that it prevented the movement of railroad cars into and out of plaintiff's [respondent's] premises by a common carrier without danger of physical

---

[9] The Missouri Supreme Court relied upon *Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490, for the proposition that a state court retains jurisdiction over this type of suit. But *Giboney* was concerned solely with whether the State's injunction against picketing violated the Fourteenth Amendment. No question of federal preemption was before the Court; accordingly, it was not dealt with in the opinion.

injury to the pickets, and movement of the cars was stopped for that reason." The Missouri Supreme Court stated that "the transportation into and out of the plant was stopped 'because it endangered their [presumably the pickets'] lives and limbs'; . . . ." 364 Mo., at 581, 265 S. W. 2d, at 330. We do not read this as an unambiguous determination that the IAM's conduct amounted to the kind of mass picketing and overt threats of violence which under the *Allen-Bradley Local* case give the state court jurisdiction. It does not preclude the conclusion that the transportation was stopped for fear of crossing an otherwise peaceful picket line. In any event, the state injunction enjoined all picketing.

*Reversed and remanded.*

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.