108 So.2d 350

**ALABAMA HIGHWAY EXPRESS, INC.,**
a corporation,

v.

**LOCAL 612, INTERNATIONAL BROTHER-HOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA,** an Unincorporated Association, et al.

6 Div. 91.

Supreme Court of Alabama.

Jan. 8, 1959.

Lange, Simpson, Robinson & Somerville, Jas. A. Simpson, Robt. Mc.D. Smith, Birmingham, for appellant.

394

Coretti & Newsom, Birmingham, and Hawkins & Rhea, Gadsden, for appellees.

SIMPSON, Justice.

This is an appeal from a final decree of the Circuit Court of the Tenth Judicial Circuit, dissolving a temporary injunction theretofore in effect and dismissing the cause on the ground that the courts of this state lack jurisdiction of the subject matter. There were several complainants beside the appellant, Alabama Highway Express, but only that complainant has appealed.

Complainants' verified bill of complaint, praying for relief against threatened picketing and other conduct, alleged to be for an unlawful purpose, was presented to the lower court and on the giving of an in-

junction bond in the amount of $1,000, a temporary writ was issued by the Register.

The bill alleges: Complainant, Alabama Highway Express, Inc., is a motor carrier for hire and carries on both intrastate and interstate business. It operates on a so-called "lease operator" system. Under this system, the complainant owns no trucks, trailers, or other vehicles which are devoted to its over-the-road transport business; all of the tractors used in hauling freight in complainant's motor transport business are owned by others with whom it has entered into certain lease agreements under which such owners are obligated to furnish tractors and drivers therefor to carry out such portion of complainant's business as may be assigned to them. The owners of such tractors are paid a percentage of the revenue earned from trips made with such equipment, driven by the drivers employed by the owners thereof. Each unit is driven or operated by either the owner or an employee of the owner. Complainant pays no wages or salaries to the drivers of the units leased. These drivers are paid by the owners of the equipment and are responsible directly to them. The lease agreements, which are all identical except for data which are necessarily variable between each party to the lease, solely establish the legal relationship between complainant and the equipment owners and drivers.

Joined as complainants are various owners of trucking equipment leased to Alabama Highway Express, owner-drivers, and drivers employed by such owners. Respondents are Local 612 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, with its principal office in Birmingham, Alabama; the International Brotherhood itself, with principal office at Washington, D. C.; and M. R. Sherman, the business agent of Local 612 and a member and agent of the International Union.

Respondents are alleged to have presented to complainant on a stated day union contracts and to have demanded that they be executed by complainant upon penalty of having its places of business picketed. Complainant had not previously entered into any labor agreement of any kind, and no union had been recognized as the bargaining agent for the drivers of the vehicles leased by the complainant. But, it was alleged, complainant did not object to any of the drivers being members of any union and had affirmatively made such fact known to the drivers. One-third of the drivers of its leased equipment were members of respondent labor unions. The bill avers, however, that a majority of the drivers were not members of any labor union or organization, and furthermore, that an overwhelming majority of the drivers did not desire to join Local 612 or any other labor union. It was averred that all or substantially all of the drivers had expressed the preference that complainant not enter into any agreement which would require that the drivers become members of any union. Complainant further averred that it had at no time discriminated against any union member drivers, either directly or indirectly.

In each of the two contracts presented it was provided that complainant shall recognize respondent unions or their agencies as exclusive bargaining representatives for all of the persons driving equipment leased by complainant and for owner-lessors thereof. The agreement further provided:

"(b) All present employees who are members of the Local Union on the effective date of this subsection shall remain members of the Local Union in good standing as a condition of employment. All present employees who are not members of the Local Union and all employees who are hired hereafter shall become and remain members in good standing of the local unions as a condition of employment on and after the 31st day following the effective date of this subsection, whichever is the later. This provision shall be made and become effective as of such time as it may be made and be-

come effective under the provisions of the National Labor Relations Act, but not retroactively."

The contract further provided:

"In all cases, hired or leased equipment shall be operated by an employee of the certificated or permitted carrier."

Respondent Sherman, business agent for Local 612 and member and agent of the International Union, notified the complainant's president that a certain day would be the deadline for accession to the union's demands. Picketing was to begin on that morning unless the contract requested was accepted by the complainant.

Complainants allege in the bill that a contract containing such provisions is in violation of the Alabama Right to Work Law (Section 375(1) et seq. of Title 26, Code 1940) and that the picketing would therefore be for an unlawful purpose. It is further alleged that the threatened acts are imminent and that unless enjoined by the Circuit Court the complainants will sustain irreparable injury. There is no allegation of violence, threats of violence, mass picketing, or unannounced work stoppages.

Attached to the bill as an exhibit was a typical lease agreement. Also attached to the bill as exhibits were affidavits of the individual complainants joined with the Express Company relative to their lease relationship and methods of operation, etc.

Upon the ex parte presentation of the verified bill, with the supporting affidavits, several days before the stated deadline, the Circuit Court ordered the issuance of a temporary injunction. Several days thereafter respondents, appearing specially, filed a plea in abatement attacking the jurisdiction of the state court on the ground that the allegations of the bill placed the case within the field exclusively reserved to the National Labor Relations Board by the Labor Management Relations Act of 1947 (29 U.S.C.A. § 141 et seq.), common-

ly known as the Taft-Hartley Act. The plea closes with a prayer that the cause be abated and dismissed and that the temporary injunction or restraining order be dissolved.

Some time later, a decree was rendered, which recited that the cause was "submitted for decree upon the application of the complainants for a temporary injunction upon the bill of complaint, the plea in abatement, as amended, of the respondents, the several supporting affidavits filed on behalf of the complainants and the respondents, respectively, and the stipulation of counsel that complainants are engaged in interstate commerce as defined by the Federal Labor Management Relations Act." The decree proceeded to deny the application for a temporary injunction and to set aside the fiat previously issued. The decree further recited that the "cause being further submitted on motion of the complainants to test the legal sufficiency of respondents' amended plea in abatement, and upon the supporting affidavits of the respective parties offered proof and disproof of said amended plea, and upon consideration thereof, the Court is of opinion that said amended plea is legally sufficient and supported by the proof and said stipulation." It was then decreed by the court that the cause be dismissed.

There are ten separate assignments of error, but they all present one major question: Did the Circuit Court err in determining it did not have jurisdiction of the subject matter?

It is the contention of appellant that where independent contractors, and not employees, are involved, the National Labor Relations Board has no jurisdiction and the state courts are therefore left free without limitation by the so-called "preemption" doctrine. It is the further contention of appellant that even if the lease operators in this case were to be considered "employees", the state courts would still have jurisdiction of this case since the matter of compulsory union contracts has been expressly left to the states by Section

14(b) of the Taft-Hartley Act [29 U.S.C. A. § 164(b)].

█ The verified bill of complaint with the attached affidavits and the plea in abatement to the jurisdiction of the court were the only pleadings in the cause. Every reasonable intendment, not contradicted by the face of the pleadings, will be made in favor of the jurisdiction of the Circuit Court. Hence a plea in abatement to the jurisdiction must allege facts which exclude every condition under which jurisdiction may be lawfully exercised by that court. Atlantic Coast Line R. Co. v. Ballard, 202 Ala. 354, 80 So. 436.

The trial court apparently believed that the power to determine jurisdiction in a case of this sort had been laid exclusively in the National Labor Relations Board. And on oral argument counsel for appellees contended that whether the lease operators in this case were in fact "employees" or "independent contractors", a matter to be discussed later, was first to be determined by the N.L.R.B.—that the courts of this state may not decide this question for themselves. It would seem that this position is still urged by appellees in their supplementary brief filed subsequent to the oral argument.

█ But the authority is clear to the effect that every court of general jurisdiction has judicial power to determine the question of its own jurisdiction. Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L. Ed. 104; Texas & Pacific Railway Co. v. Gulf, Colorado & Santa Fe Railway Co., 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578; Ex parte Board of Education of Blount County, 264 Ala. 34, 84 So.2d 653; Crump v. Knight, 256 Ala. 601, 56 So.2d 625; Ex parte Union Planters Nat. Bank & Trust Co. of Memphis, Tenn., 249 Ala. 461, 31 So. 2d 596; Ex parte Textile Workers Union of America, 249 Ala. 136, 30 So.2d 247; Goodman v. Winter, 64 Ala. 410; 14 Am. Jur. 368, § 168.

We have received what we believe to be a relatively recent reaffirmation of this principle by the United States Supreme Court in the case of Amalgamated Clothing Workers of America v. Richman Brothers Co., 348 U.S. 511, 75 S.Ct. 452, 458, 99 L. Ed. 600, which involved the doctrine of federal preemption, where Justice Frankfurter, speaking for the Court, observed:

"In any event, if resort to a state court may not be circumvented by the power of the Board to entertain such a complaint, we are bound to repeat that, insofar as a penumbral region must remain between state and federal authority touching industrial relations until finally clarified by definitive rulings here or further legislation by Congress, state litigation must, in view of § 2283 [28 U.S.C., § 2283], be allowed to run its course, including the ultimate reviewing power in this Court."

This conclusion was likewise reached by the Supreme Court of Texas in Ex parte Twedell, Tex., 309 S.W.2d 834, decided in January of 1958, on the authority of the Richman Brothers case, after a detailed discussion of the cases of Guss v. Utah Labor Relations Board, 353 U.S. 1, 77 S. Ct. 598, 1 L.Ed.2d 601; Amalgamated Meat Cutters and Butcher Workmen of North America, Local No. 427, A. F. L. v. Fairlawn Meats, Inc., 353 U.S. 20, 77 S.Ct. 604, 1 L.Ed.2d 613; and San Diego Building Trades Council v. Garmon, 353 U.S. 26, 77 S.Ct. 607, 1 L.Ed.2d 618.

Appellees' plea in abatement invoking the doctrine of preemption is thus pleaded:

"By the provisions of said Act [Labor Management Relations Act of 1947], the Congress of the United States in the exercise of its power over interstate commerce has preempted and exclusively occupied the field of regulation of labor relations in industries in or affecting interstate commerce, and this Court is without jurisdiction over such subject matter. The subject matter of the complaint herein lies within that preempted field."

, The trial court sustained the sufficiency of the plea on that theory. Appellant, on the contrary, contended strenuously that the entire field of labor management relations has not been preempted by the federal legislation; that there remains a substantial area within which states may act; that regulation of the activity complained of in this case is reserved to the states by an express declaration of Congress. After a careful consideration of recent authority and upon a reasonable construction of the Labor Management Relations Act, we find ourselves in agreement with the appellant.

The United States Supreme Court has observed the general fact that Congress has not seen fit in either the National Labor Relations Act or the Labor Management Relations Act "to declare either a general policy or to state specific rules as to their effects on state regulation of various phases of labor relations over which the several states traditionally have exercised control." International Union, U. A. W. A. A. F. of L., Local 232 v. Wisconsin Employment Relations Board, 336 U.S. 245, 69 S.Ct. 516, 521, 93 L.Ed. 651.

But the general theory of the Federal cases dealing with the subject is that "the national Labor Management Relations Act * * * leaves much to the states, though Congress has refrained from telling * * * how much". Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776 (A. F. L.), 346 U.S. 485, 74 S.Ct. 161, 164, 98 L.Ed. 228; Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 75 S.Ct 480, 99 L.Ed. 546.

It is also recognized that the solution to the Federal-State jurisdictional problem is not always an easy one and that it must necessarily be dealt with on a case-to-case basis. Weber v. Anheuser-Busch, Inc., supra.

As a general proposition the decisions of the Federal Courts have established the principle that where conduct is characterized by the Federal legislation as an "unfair labor practice", the state has no con-

current jurisdiction to prohibit or in any way deal with the same conduct, absent exceptional circumstances such as violence, mass picketing, etc., even though a state's substantive law and its remedies may be consistent with the Federal Act. Anheuser-Busch and Garner cases, supra.

And it may be that the conduct here alleged would be within the preempted field relegated exclusively within the jurisdiction of the N.L.R.B. were it not for the impact of the state's Right to Work law on this general principle—a matter which we will now discuss.

The gravamen of the bill is that the contract demanded by the respondents of the complainant includes a Union shop clause, which is in contravention of the State's Right to Work law (Section 375(1) et seq. of Title 26, Code 1940), and that the respondents will cause the complainant's places of business to be picketed for the purpose of coercing the complainant to execute the contract in violation of the laws and public policy of the State of Alabama. The bill further alleges that such purpose is, on the grounds alleged therein, unlawful. Section 375(2) of the Alabama Right to Work Law provides:

"Any agreement or combination between any employer and any labor union or labor organization whereby persons not members of such union or organization shall be denied the right to work for said employer, or whereby such membership is made a condition of employment or continuation of employment by such employer, or whereby any such union or organization acquires an employment monopoly in any enterprise, is hereby declared to be against public policy and an illegal combination or conspiracy."

Section 375(3) adds the following provision:

"No person shall be required by an employer to become or remain a member of any labor union or labor organ-

ization as a condition of employment or continuation of employment."

We are confronted then with the question, whether threatened peaceful picketing which is for a purpose unlawful under the Right to Work Law of the State falls within the protective scope of Section 7 of the Federal Act.

Section 7 of the Labor Management Relations Act provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, *and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3).*" (Emphasis supplied.)

Section 8(a) (3) mentioned in the quoted section authorizes the execution of a union shop agreement pursuant to certain qualifications listed therein. However, these sections must be considered in pari materia with Section 14(b) of the Act, which reads:

"Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

■ Congress has therefore unequivocally expressed its intention to leave to what is left of states' sovereignty in the field of interstate labor relations the power to either permit or prohibit contracts containing union security provisions requiring membership in a labor organization as a condition of employment. The Congressional intent in enacting Section 14(b) clearly appears in the Conference Committee Report, House Report No. 510, dated June 3, 1947 (U.S.Code Congressional Service, 80th Congress, First Session, 1947, p. 1166), where the following appears:

"Under the House bill there was included a new section 13 of the National Labor Relations Act to assure that nothing in the act was to be construed as authorizing any closed shop, union shop, maintenance of membership, or other form of compulsory unionism agreement in any State where the execution of such agreement would be contrary to State law. Many States have enacted laws or adopted constitutional provisions to make all forms of compulsory unionism in those States illegal. It was never the intention of the National Labor Relations Act, as is disclosed by the legislative history of that act, to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism. Neither the so-called 'closed shop' proviso in section 8(3) of the existing act nor the union shop and maintenance of membership proviso in section 8(a) (3) of the conference agreement could be said to authorize arrangements of this sort in States where such arrangements were contrary to the State policy. To make certain that there should be no question about this, section 13 was included in the House bill. The conference agreement, in section 14(b), contains a provision having the same effect."

This principle is reiterated by Justice Frankfurter, who, speaking for the Court, in Algoma Plywood & Veneer Co. v. Wisconsin Emp. Relations Board, 336 U.S. 301, 69 S.Ct. 584, 591, 93 L.Ed. 691, stated:

"Other provisions of the Taft-Hartley Act make it even clearer than the National Labor Relations Act that the States are left free to pursue their

own more restrictive policies in the matter of union-security agreements. Because § 8(3) of the new Act forbids the closed shop and strictly regulates the conditions under which a union-shop agreement may be entered, § 14(b) was included to forestall the inference that federal policy was to be exclusive."

■ We, therefore, hold upon general principle and sound authority [Local Union No. 10, United Ass'n of Journeymen, Plumbers & Steamfitters, et al. v. Graham, 345 U.S. 192, 73 S.Ct. 585, 97 L.Ed. 946; Algoma Plywood & Veneer Co. v. Wisconsin Emp. Relations Board, supra; Minor v. Building and Construction Trades Council, N.D., 75 N.W.2d 139; and Pleasant Valley Packing Co., Inc. v. Talarico, 5 N.Y.2d 40, 177 N.Y.S.2d 473, 152 N.E.2d 505], that the state possesses jurisdiction to enjoin picketing for an unlawful purpose, although peaceful, when in contravention of the public policy as declared in the State's Right to Work Law.

The plea in abatement, as amended, avers that the subject alleged in the instant case is regulated by Section 8(b) (1) and Section 8(b) (4) of the Labor Management Relations Act. We do not believe that the plea can be sustained on such a theory. Regardless of any technical construction which might be placed on these provisions of the Act, pertaining to union security agreements authorized under the federal act, and of any doubts concerning the applicability of other relevant provisions of the Taft-Hartley Act to the case at bar, it is clear that Section 14(b) preserves to the states jurisdiction to act in this narrowly defined field, when they have so legislated.

It results as our conclusion that the lower court was in error in holding the plea in abatement to the jurisdiction legally sufficient and dismissing the cause for lack of jurisdiction.

■ But there is yet another reason—which is by no means mere dictum (Usher

v. Department of Industrial Relations, 261 Ala. 509, 75 So.2d 165)—which must require a reversal of the decree. The discussion to this point has assumed that the respondents in this cause are "employees" within the meaning of the Labor Management Relations Act and are entitled by virtue of that designation to invoke the exclusive jurisdiction of the National Labor Relations Board when the proper circumstances exist. If the coercive effect of the picketing threatened is not aimed at "employees", there can be no unfair labor practice under the Federal Act. National Labor Relations Board v. Nu-Car Carriers, Inc., 3 Cir., 189 F.2d 756; Rubin v. American Sportsmen Television Equity Soc., 40 Cal.2d 412, 254 P.2d 510; Brewery and Beverage Drivers and Workers, Local No. 67, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A. F. L. and Bernard Rosenberg, 107 N.L.R.B. 299; 29 U.S.C.A. § 158(b) (1).

Section 2(3) of the Act excludes any individual having the status of an independent contractor from the definition of the term "employee". Appellant has at all times insisted that these lease-operators are not employees, and the bill of complaint has characterized them as independent contractors.

In United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 1471, 91 L.Ed. 1757, which affirmed the case of Harrison v. Greyvan Lines, Inc., 7 Cir., 156 F.2d 412, the Supreme Court declared:

"There are cases, too, where driver-owners of trucks or wagons have been held employees in accident suits at tort or under workmen's compensation laws. But we agree with the decisions below in Silk and Greyvan [United States v. Silk, 10 Cir., 155 F.2d 356; Greyvan Lines v. Harrison, 7 Cir., 156 F.2d 412], that where the arrangements leave the driver-owners so much responsibility for investment and management as here, they must be held

to be independent contractors. These driver-owners are small businessmen. They own their own trucks. They hire their own helpers. In one instance they haul for a single business, in the other for any customer. The distinction, though important, is not controlling. It is the total situation, including the risk undertaken, the control exercised, the opportunity for profit from sound management, that marks these driver-owners as independent contractors."

■ The National Labor Relations Board applies the common-law "right of control" test in determining whether an individual is an independent contractor or an employee under the Act. "Under this test, an employer-employee relationship exists where the person for whom the services are performed reserves the right to control not only the end to be achieved but also the means to be used in reaching such end. The resolution of this question depends on the facts of each case and no one factor is determinative." Oklahoma Trailer Convoy, Inc., 99 N.L.R.B. 1019.

■ According to the allegations of the bill the complainant Highway Express owns no trucks or tractors, but all of the tractors used in hauling freight in its transport business are owned by the lease operators with whom complainant has entered into contracts for the lease of such vehicles. Ownership of the facilities to be used gives rise to an inference of that control over the manner of performance which is associated with the status of an independent contractor. Oklahoma Trailer Convoy, Inc., supra. The lease operators are paid a percentage of the revenue earned from hauls made with the equipment driven by the owners or the drivers employed by them. About one-half of the units leased by the complainant are driven by the owners themselves, and the other half are driven by employees of the owners. The fact that the owners decide whether to drive the trucks themselves or to employ others to do so is significant. Oklahoma Trailer Convoy, Inc., supra. The bill avers that the drivers employed by the lease operators are paid no wages or salary by the complainant but are paid by the owners. Such drivers are directly responsible to the owners. It is further alleged that the owners regularly withhold income tax according to Internal Revenue Regulations as well as social security payments required by law and that some of the owners are required to deduct unemployment compensation tax for such employees. Some of the lease operators are indebted in large sums for transportation equipment bought from vendors of such equipment.

Limiting our conclusion to a construction of the Federal Act, we think and hold that the relationship of the complainant and the separate lease operators shown by the facts pleaded, as well as the affidavits reproduced in the record, is one of independent contractor. It appears that a great deal of responsibility for investment and management resides in the lease operators. They stand to either make a profit or lose. For aught that appears, the legal relationship is one of a bona fide lease. The operators own their own trucks. They hire their own helpers. The "total situation" here adds up to the conclusion that the lease operators are independent contractors, within the meaning of said Act. The correctness of this conclusion is also borne out by the decisions of the National Labor Relations Board. Oklahoma Trailer Convoy, Inc., supra; Eldon Miller, 107 N.L.R.B. 557; Malone Freight Lines, Inc., 106 N.L.R.B. 1107, 107 N.L.R.B. 501; Consolidated Forwarding Company, Inc., 112 N.L.R.B. 357.

This case must be reversed and remanded. But it should be observed that this opinion has dealt with the question of jurisdiction solely—not the merits of the controversy.

Reversed and remanded.

All the Justices concur.