360 P.2d 204

**SHEET METAL WORKERS INTERNA-
TIONAL ASSOCIATION, an unincorpo-
rated association, Appellant,**

v.

**Carl A. NICHOLS, Appellee.**

No. 6628.

Supreme Court of Arizona.

March 8, 1961.

Rehearing Denied May 23, 1961.

Darrell R. Parker and C. A. Muecke, Phoenix, and Gilbert, Nissen & Irvin, Beverly Hills, Cal., for appellant.

Carl D. Hammond, Kingman, Albert M. Dreyer, Las Vegas, Neb., and Evans, Kitchel & Jenckes, Phoenix, Denison Kitchel, Morton M. Scult, and Otis D. Sullivan, Phoenix, of counsel, for appellee.

UDALL, Justice.

This is an appeal from a judgment of the superior court of Mohave county granting appellee $15,000 compensatory and $35,000 punitive damages. The complaint named appellant Sheet Metal Workers International Association and three foreign corporations as defendants. None of the three corporations was served with summons or complaint and none appeared in the action.

Appellee has alleged and attempted to prove a conspiracy to enter into an oral agreement to deprive him of his employment by effecting and enforcing a compulsory union contract in violation of Arizona Constitution, Art. XXV, A.R.S., as implemented by A.R.S. § 23–1302 (the so-called "right-to-work" provision). Both the Constitution and statute read as follows:

"No person shall be denied the opportunity to obtain or retain employment because of nonmembership in a labor organization, nor shall the state or any subdivision thereof, or any corporation, individual, or association of any kind enter into an agreement, written or oral, which excludes a person from employment or continuation of employment because of nonmembership in a labor organization."

The allegations of the complaint if proved admittedly show a violation of subsections 8(a) (3) and 8(b) (2) of the Labor Management Relations Act (29 U.S.C.A. § 141 et seq.) and that the defendants are subject to the jurisdiction of the National Labor Relations Board by virtue of their doing business affecting interstate commerce within the standards set by the federal statute.

The appellee filed an unfair labor practice charge with the regional director of the National Labor Relations Board who refused to issue a complaint for lack of sufficient evidence. It seems to be undisputed that the failure to issue a complaint was for a lack of evidence of a violation of the federal act rather than for lack of evidence of sufficient effect on interstate commerce to warrant NLRB action. The effect of the latter probably would permit state jurisdiction under L.M.R.A. § 14(c) as amended 1959.

■ We are met at the outset of this appeal with the contention that the superior court did not have jurisdiction to hear this case. It is true, as a general rule, that where (as in this case) the allegations if proved would show a clear violation of §§ 8(a) (3) and 8(b) (2) of the L.M.R.A. by defendants whose businesses unquestionably affect interstate commerce as defined by the L.M.R.A., the United States Supreme Court has held that exclusive jurisdiction vests in the NLRB and that the state and federal courts are ousted from jurisdiction even though the same acts may constitute a violation of state law and give rise to a cause of action in a state court. This rule arises because Congress has expressed its judgment in favor of uniformity where the labor disputes affect interstate commerce. Guss v. Utah Labor Relations Board, 353 U.S. 1, 77 S.Ct. 598, 609, 1 L. Ed.2d 601.

However, some exceptions permitting concurrent jurisdiction seem to remain. See e. g., L.M.R.A. § 10(a); United Const. Workers, etc. v. Laburnum Const. Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025; International Union, United Auto., Aircraft and Agr. Implement Workers of America (UAW–CIO) v. Russell, 356 U. S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030; International Ass'n of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018. Appellee urges that one such exception covers the facts alleged in this case; that is, acts constituting violation of both the L.M.R.A. and state regulation of union security agreements. Appellee relies primarily on the authority of L.M.R.A. § 14 (b) as construed in Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, 336 U.S. 301, 69 S.Ct. 584, 93 L.Ed. 691.

The language of subsection 14(b) fairly suggests that appellee is correct:

"Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

It seems clear to us that the interpretation given § 14(b) by the Supreme Court in Algoma fixes its meaning at a scope broad enough fully to encompass appellee's interpretation of that section. The facts of that case were essentially identical with those alleged in this case. The employee in that case was discharged pursuant to a compulsory union agreement. The issue before the court was federal preemption. The Court held that the State of Wisconsin properly could grant damage relief for a discharge made pursuant to a contract which violated Wisconsin union security laws despite the fact that a federal agency had validly compelled the defendant to make the objectionable contract. The Court indicated that Congress had granted permission to "the States by § 14(b) of the Taft-Hartley Act to carry out policies inconsistent with the Taft-Hartley Act itself." Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, supra at 336 U.S. 315, 69 S.Ct. 592.

The opinion of the Court in Algoma made quite clear that the federal act did not merely adopt by reference the state regulation of union security agreements. The Court said at 336 U.S. 313–314, 69 S.Ct. 591:

"Other provisions of the Taft-Hartley Act make it even clearer than the National Labor Relations Act [Wagner Act] that the States are left free to pursue their own more restrictive policies in the matter of union-security agreements. Because § 8(3) of the new Act forbids the closed shop and strictly regulates the conditions under which a union-shop agreement may be entered, § *14(b) was included to forestall the inference that federal policy was to be exclusive.*" (Emphasis supplied.)

And further at the same page:

"It is argued, however, that the effect of this section is to displace State law which 'regulates' but does not wholly 'prohibit' agreements requiring membership in a labor organization as a condition of employment. But if there could be any doubt that the language of the section [14(b)] means that the Act shall not be construed to authorize any 'application' of a union-security contract, *such as discharging any employee, which under the circumstances 'is prohibited' by the State,* the legislative history of the section would dispel it." (Here follow citations to the legislative history.) (Emphasis supplied.)

The allegations of the appellee in this case come squarely within the Court's language; appellee's discharge which under the circumstances was prohibited by the Arizona union security statute or in other words the "application" of a contract "prohibited" by state union security law.

It is argued, however, that subsequent Supreme Court decisions impair the validity of Algoma. It is true that most of the cases developing the broad sweep of the federal preemption doctrine have been decided since Algoma. See especially Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228; Weber v. Anheuser Busch, Inc., 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546; Guss v. Utah Labor Relations Board, supra; San Diego Building Trades Council v. Garmon, 353 U.S. 26, 77 S.Ct. 607, 1 L.Ed.2d 618; San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775. However these cases may have broadened the sweep of federal preemption and narrowed the scope of Algoma we do not think they have impaired the validity of the narrow holding of Algoma and thus our jurisdiction over fact situations of the type alleged in this case.

Appellant contends that Plankinton Packing Co. v. Wisconsin Employment Relations Board, 338 U.S. 953, 70 S.Ct. 491, 94 L.Ed. 588, overrules the Algoma decision. We think there is no merit in this contention. In fact, since the Plankinton decision Algoma has been repeatedly cited as subsisting and valid law. See e. g., Weber v. Anheuser Busch, Inc., supra; Local 24 of International Brotherhood of Teamsters, etc. v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312; San Diego Building Trades

Council, Millmen's Union, Local 2020 v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed. 2d 775 (concurring opinion of Harlan, J., in which he reminds the author of the majority opinion of some of the exceptions to the broad sweep of the Court's opinion which are still to be recognized). Furthermore, Plankinton did not involve the application of a union security agreement. There was an agreement in that case, but the employee who was discharged in that case was not discharged under the terms of that agreement. The agreement required retention of membership by all who were members after a certain date. The aggrieved employee in that case had terminated his membership before the agreed date so was not discharged in execution of the prohibited union security agreement. In view of the cases relied on by the Supreme Court in its cryptic per curiam decision, we do not think that the Court considered Plankinton to involve the exception relied on in this case.

Of the cases cited by appellant in favor of federal preemption, none involved the exception contended for in this case. Only one deserves some attention to indicate in what way it is to be distinguished from the case at hand. Local Union 429, International Brotherhood, etc. v. Farnsworth & Chambers Co., 353 U.S. 969, 77 S.Ct. 1056, 1 L.Ed.2d 1133, was a per curiam reversal of a Tennessee decision granting an injunction against picketing, one of the

purposes of which may have been to force the employer to enter into a compulsory union agreement and not the implementation of an already executed agreement. The exception for which Algoma stands relates to executed union security agreement and not picketing to force the execution of such an agreement. Such a distinction is justified under the language of subsection 14(b) as interpreted in Algoma. In addition it is to be noted that one of the cases cited in the per curiam decision of Farnsworth & Chambers (Weber v. Anheuser Busch, Inc., supra) distinguished and reaffirmed Algoma.

The legislative history of § 14(b) shows even more persuasively that state control over union security agreements was to remain unaffected either by protections or prohibitions of the federal act. Section 13 of the House version of L.M.R.A. provided that union security arrangements were "divested of their character as a subject of regulation by Congress under its power to regulate commerce * * * to the extent that such agreements shall, in addition to being subject to any applicable provisions of this Act, be subject to the operation and effect of such state laws and constitutional provisions as well." H.R. 3020, 80th Cong., 1st Sess. (1947), 1 Legis.Hist. 80–81. The Senate bill did not contain a corresponding provision. Subsection 14(b) as it now reads was agreed to in the course of conference to reconcile the House and Senate bills. The report of the conferees to the House included the following:

"It was never the intention of the National Labor Relations Act * * * to preempt the field * * * so as to deprive the States of their powers to prevent compulsory unionism. * * * To make certain that there should be no question about this, section 13 was included in the House bill. The conference agreement, in Section 14(b), contains a provision having the same effect." H.R.Rep. No. 510, 80th Cong. 1st Sess. 60 (1947), 1 Leg.Hist. 564.

Senator Taft, the Senate sponsor of the bill, said in speaking of § 14(b): "The Senate committee report states on its face that State laws would still remain in effect. All we have done is to write in expressly what our committee report said." 2 Legis.Hist. 1546.

Leading writers in the field of labor law are in agreement with our understanding of the history and meaning of § 14(b). The following is a representative example:

"The legislative history of subsection 14(b) suggests that its purpose was not merely to sanction state regulations more restrictive than the federal prohibitions, but rather to preserve concurrent state regulation without regard to whether it supplemented or overlapped the federal scheme. In other words, the legislative history indicates

that subsection 14(b) was designed to preserve for the states the same power to deal with union security arrangements which they had under the Wagner Act." Meltzer, The Supreme Court, Congress, and State Jurisdiction Over Labor Relations: I, 59 Colum.L. Rev. 6, 41–42.

See also, e. g., Michelman, State Power to Govern Concerted Employee Activities, 74 Harv.L.Rev. 641, esp. at 679; and Cox, Federalism in the Law of Labor Relations, 67 Harv.L.Rev. 1297, esp. at 1333 et seq., where the author urges repeal of § 14(b) because of its conflict with the general scheme of uniform regulative power.

■ In light of the facts in this case and the posture of the applicable federal law we conclude that the trial court correctly assumed jurisdiction of this case to hear proof on the allegations of the complaint. We are supported in our view on this matter by Alabama Highway Express, Inc. v. Local 612, 268 Ala. 392, 108 So.2d 350.

Our determination that the trial court had jurisdiction to entertain the action is not dispositive of this appeal. Appellant has made 61 assignments of error in addition to the one already treated. The bombardment of this court with assignments of error is equalled only by the bombardment of hearsay which the record reveals the trial court was subjected to, all apparently in the name of conspiracy. This record clearly demonstrates that the doctrine of conspiracy which was introduced in aid of justice can so readily be employed to defeat it. But regardless of the difficulties presented by cases sounding in conspiracy, they are not a license to abandon the rules of evidence relating especially to hearsay. We will not attempt to deal with all the assignments of error even though several may have merit. We believe one major issue is deserving of our present attention and is dispositive of this appeal.

■ The question to which we turn our attention is the admission of hearsay and multiple hearsay on hearsay offered by appellee. It is true that the rules of evidence governing the trial of matters sounding in conspiracy permit the introduction of certain limited hearsay statements by co-conspirators not otherwise admissible. The exception has two important limitations. First, the existence of the conspiracy and the membership therein of both the declarant and the alleged conspirator against whom the declaration is offered must be shown by independent evidence. We long ago adopted this position. In Territory v. Turner, 4 Ariz. 290, 292, 37 P. 368, 369, we said:

"This was in the absence of the defendants, and no evidence had been introduced showing that a conspiracy had taken place, and could only preju-

**194**

dice the jury. It is said to be a rule of ancient standing that the conspiracy should be first established, *prima facie,* before the acts and declarations of a co-conspirator can be admitted in evidence against another."

Stated another way:

"To render evidence of the acts or declarations of an alleged conspirator admissible against an alleged co-conspirator, the existence of the conspiracy must be shown and the connection of the latter therewith established." Thomas v. United States, 10 Cir., 57 F.2d 1039, 1041.

And further:

"Declarations made by one conspirator to another are not competent evidence to establish the connection of a third person with the conspiracy." Ibid.

Still further:

"The existence of the conspiracy charged cannot be established against an alleged conspirator by evidence of the acts or declarations of his alleged co-conspirator done or made in his absence." Id., at page 1042.

We have more recently fully reaffirmed this principle in State v. Sullivan, 68 Ariz. 81, 200 P.2d 346.

■ The second restriction on this exception arises out of the fact that this exception is based on the principle that one conspirator is the agent of the other and that each is therefore bound by the statements or acts of the other in execution of the agency. Thus not all statements or acts of co-conspirators are admissible against his fellow conspirators. They must be made or done during the pendency of the live conspiracy and in furtherance of its purposes. In other words, a conspirator-principal is not bound by the acts of a conspirator-agent outside the scope of his conspiratorial agency. Statements are not admissible if they are declarations of past acts or if mere opinion of one conspirator but must be made to aid the prosecution of the conspiracy. Ex parte Decker, 65 Ariz. 122, 175 P.2d 204.

Even assuming that the existence of the conspiracy and the complicity therein of the declarants and this appellant were independently proved, many of the hearsay statements admitted at trial would not have been admissible under the test which we have here reiterated. But we need not deal with each of the 19 instances of hearsay or hearsay upon hearsay assigned as error on this appeal since we are satisfied that the initial burden of showing the existence of the conspiracy by independent non-hearsay evidence was never met in this case.

■ Stripped of all the inadmissible hearsay appellee's proof shows only the following on the issue of the existence of

a conspiracy between appellant and the three alleged co-conspirators: (1) appellee was a journeyman sheet metal worker with many years experience, (2) appellee was expelled from appellant union (appellee does not contend that this expulsion was wrongful), and that (3) appellee was thereafter discharged from three successive jobs. With two exceptions to be noted hereinafter, even appellee admits that this is the sum and substance of all the non-hearsay evidence which he produced to prove the existence of the conspiracy and appellant's connection therewith. But appellee contends that these facts alone are sufficient to make out a prima facie case of conspiracy. We cannot agree with this contention.

If the mere fact of an expulsion from a labor organization, combined with later discharges from employment by various employers is sufficient to constitute a prima facie case for conspiracy to violate an "open shop" law, then every employer discharging a nonunion employee for any reason whatever would do so at the peril of being subjected to spurious suits wherein hearsay statements of alleged co-conspirators would be freely admissible against him whether or not there were any connection between the employers or the union. This case is illustrative. Here there was no evidence to show that three of the alleged conspirators (the owners and officers of each of the employer companies) even knew each other. If we are to accept as true appellee's allegations concerning the existence of the conspiracy, we are confronted with the further anomaly that two of the alleged conspirators actually hired appellee in violation of the alleged conspiratorial agreement after it had been entered into and while it was allegedly in force.

Other evidence in the record reveals sufficient explanation for the discharges to completely negate the inference of a conspiracy sought to be drawn. On at least one of the jobs there was evidence of insubordination by appellee and on another the record shows that the entire job was terminated and the entire crew dismissed.

Appellee contends that two other items of evidence tend to prove the existence of the conspiracy. Appellee urges upon us his testimony that in connection with each of the discharges he was told "in effect" by the "boss" who discharged him that the reason was his nonmembership in the union. Apparently appellee feels that this court should take the view, under the theory of judicial notice, that a "boss" would never discharge an employee for nonmembership in the union unless a conspiracy existed between the discharging employer and the union. This court finds no such necessary inferential connection between the "bosses'" expressed reasons for discharge and the existence of a conspiracy. This is classic hearsay and

whether or not admissible against the company discharging appellee under some theory such as res gestae it still is not admissible against appellant or to prove the existence of the conspiracy. The statements of one conspirator cannot prove the complicity of another alleged conspirator if made in the latter's absence. State v. Sullivan, supra. In any event, mere discharge by an employer for nonmembership in a union in no way tends to prove that the action of the employer was anything other than unilateral.

The final item is appellee's contention that the evidence shows that officers of appellant union, as appellee so aptly put it, "in effect, or, in so many words" stated that appellee would "never be allowed to work at the trade again." Without the aid of citations to the voluminous record we have tried to find this alleged evidence. What we found fits appellee's characterization of "in effect" but does not in any way prove the existence of a conspiracy. Under Rule 5(b), par. 4 this Court, 17 A.R.S., is not required to search a 1500-page record for alleged evidence when counsel's brief fails to give proper page citations to the record. We may assume, however, for the purposes of this decision that officers of appellant union said explicitly that appellee would not be permitted to work at the trade again. Such statements would tend only to prove the attitude of the union toward appellee but falls far short of being the type of evidence which is necessary to make out a prima facie case that appellant turned its attitude into action by forming a conspiracy. When these statements were made we do not know. The fact appears from appellee's own testimony that he has worked at the trade since his first discharge when he apparently maintains the conspiracy began. We think this testimony adds nothing to the basic issue of the existence of a conspiracy.

In view of appellee's failure to make out a prima facie case of conspiracy with competent evidence we hold that it was error for the trial court to refuse appellant's motion to dismiss at the close of plaintiff's (appellee's) case-in-chief and to refuse defendant's (appellant's) requested instruction No. 1 directing a verdict for defendant. The judgment of the trial court is therefore reversed, with directions to dismiss the complaint.

STRUCKMEYER, C. J., BERNSTEIN, V. C. J., and JENNINGS and LOCKWOOD, JJ., concur.