THE STATE, EX REL. UTILITY WORKERS UNION OF AMERICA, AFL-CIO LOCAL 349, *v.* MACELWANE, JUDGE.*

---

*On July 10, 1961, it being conceded that the labor dispute had been settled, on motion by appellee an appeal from the entry of a permanent injunction was dismissed as moot.

184

(No. 5417—Decided March 3, 1961.)

*Mr. Jack Gallon* and *Mr. John J. Hunter*, for relator.
*Mr. Harry Friberg*, prosecuting attorney, for respondent.

FESS, J. This is an action in prohibition filed originally in this court on behalf of Utility Workers Union of America AFL-CIO, Local No. 349, against the respondent, judge of the Common Pleas Court of Lucas County, seeking to prevent such judge from continuing in force a temporary restraining order entered on January 27, 1961, based on the relief requested in a supplemental petition for an injunction instituted by The Ohio Fuel Gas Company in that court against the union on January 25, 1961. The petition also seeks to prevent the judge from hearing and determining the prayer for a permanent injunction in said cause; "from entertaining the supplemental petition for injunction; from in any way trenching upon the jurisdiction over labor disputes which has been withdrawn by Congress from state courts"; and, pending final determination of this cause, for an alternative writ of prohibition. Since the cause was advanced for early hearing on its merits, no alternative writ has been issued.

In the answer, defendant admits the issuance of the temporary restraining order, as set forth in the journal entry recorded on January 27, 1961, and alleges that such order was made as the court determined was proper under the evidence and the law applicable thereto and that she has no personal interest in the outcome of this case, other than to have this court determine whether or not the temporary restraining order was proper under the facts and the law.

The cause came on for hearing upon the petition in prohibition, the answer of the respondent, the evidence consisting of the original and supplemental petitions, transcript of the testimony, and the journal entry restraining the union and its members from picketing homes of supervisory employees of the gas company in case No. 189833, entitled *Ohio Fuel Gas Co. v. Utility Workers Union*, in the Common Pleas Court.

The original petition below, filed on January 21, 1961, al-

leged, *inter alia*, that as a result of a labor dispute between the plaintiff therein and the union and its members, the latter are on strike and have been picketing plaintiff's service building and its office; that the preservation of its property and the maintenance of the safety, health and welfare of the public generally requires the continued operation of its business of the distribution of natural gas to its thousands of customers, and that certain of its employees, not members of the defendant union, have been assigned, and are required, in the interest of safety, health and welfare, to operate and maintain its gas distribution system at all times and must have free and unrestrained ingress and egress to and from its service and office buildings; that defendants have engaged in mass picketing, resulting in the blocking of such access; that, during the course of such picketing, vile and opprobrious epithets threatening bodily harm have been directed toward employees not members of the union; that locks on the gates have been tampered with; that defendants have maliciously destroyed plaintiff's property by throwing stones at windows of the service building, resulting in more than 150 broken panes of glass, endangering plaintiff's employees; and that certain of its regulators in the area controlling the supply of gas have been tampered with or destroyed, resulting in depriving a number of its customers of gas in freezing weather. After alleging irreparable damage and injury to its employees, plaintiff prays that, pending final hearing and determination of the issues, an order be issued forthwith, restraining the defendants from engaging in six specifications of conduct, and, upon final hearing, for a permanent injunction.

In its supplemental petition, filed January 25, 1961, plaintiff, after incorporation of the allegations of its original petition, alleged, *inter alia*, that certain of its supervisory employees, in the interest of maintaining its service and consequent health and safety of its customers, have been assigned to operate and maintain its gas distribution system; that in the course of such work such employees are notified by telephone at their homes of the work required to be done, and of necessity begin and end their transportation to and from such work at their homes; and that the widely scattered distribution system area makes this method the most efficient and safe method of operation during the strike and most conducive to the safety,

health and welfare of plaintiff's customers and of the public generally. Plaintiff alleged further that on January 23rd its supervisory employees received the following notice from the defendant:

"To the Supervisory Personnel of Ohio Fuel Gas Co.

"It has come to our attention that you are performing our work from your homes. The federal law guarantees our right to picket on public property wherever struck work is being performed. If you continue to perform our work from your homes, we shall protect our jobs by placing a picket in front of such homes to inform the public of this work.

"Local 349
"Utility Workers of America,
"Negotiation Committee."

Plaintiff alleged further that defendants have begun picketing the residences of supervisory personnel, and prays that, pending final hearing, a restraining order be issued forthwith against the defendants, restraining them (1) from picketing before, or in the vicinity of the residences of any of plaintiff's employees; (2) from loitering, grouping or congregating at or near any approaches to, or on a public street or highway leading to any of said residences; and (3) from authorizing, directing, aiding, abetting, etc., any of the aforesaid. Plaintiff prays further that, upon final hearing, a permanent injunction be issued.

The cause came on for hearing in the Common Pleas Court on January 25th upon an oral application of the plaintiff for a temporary restraining order upon the prayer of the supplemental petition, and testimony was taken on said date and also on January 26th. That interstate commerce is involved is conceded. The hearing first proceeded upon the application of the plaintiff to advance for hearing its application for a temporary restraining order under the supplemental petition. After receiving some 20 pages of testimony, the court announced that she was satisfied that the application should be advanced for hearing and proceeded to the hearing for temporary restraining order of picketing homes of supervisory personnel. Counsel for defendants moved that the supplemental petition be dismissed and stricken from the files because it sought a remedy beyond the jurisdiction of the court. After argument and ad-

journment overnight, the court announced that she would reserve a ruling on the question of jurisdiction until after the evidence.

Since this is a proceeding in prohibition, we neither weigh the evidence nor consider whether the injunctive order below was erroneous or unsupported by the evidence. We are limited in our review of the testimony received below, as well as by the pleadings and the journal entry, to a determination whether or not the Common Pleas Court judge has usurped or intends to usurp the exclusive jurisdiction confided by the National Labor Relations Act, as amended, to the National Labor Relations Board.

Testimony adduced on behalf of the plaintiff in the injunction proceeding tended to show that on the night of the commencement of the strike there was mass picketing, with profanity, violence and vandalism in front of the service building, which was only quelled by the arrival of a squad of police officers. Testimony on behalf of the defendants tended to show that this conduct was largely ''wildcatting'' and that the major portion of the vandalism occurred prior to the official commencement of the strike at midnight. Testimony on behalf of the defendants, which is undisputed, except for one or more minor incidents, is to the effect that after the first night of the strike picketing has been peaceful, with a limited number of pickets stationed at the three gates entering the service building. A policeman has been assigned to each of the three gates. The plaintiff has also employed 27 Pinkerton men to guard nine locations, at which there has been no report of violence.

Further testimony on behalf of the plaintiff tended to show that one or two pickets had been stationed during the daytime (not at night) at the residences of supervisory employees. The wife of one of these employees testified that she had been subjected to threatening and abusive telephone calls relating to her husband and had been put in fear as a result thereof, which prevented sleep that particular night. She testified also that she had been frightened as a result of the picketing in front of her home, which testimony was refuted by the testimony of the picket himself. She also said she called an acquaintance, whom she designated a ''constable,'' who patrolled her home one evening.

There was also evidence that some 20 regulators of the flow of gas—an abnormal number—had either been destroyed or turned off, resulting in cutting off the flow of gas entirely or materially lessening the flow of gas to about 300 customers; that, as a result, it was absolutely necessary to dispatch the supervisory employees from their respective homes to correct the condition as soon as possible after discovery of the shutoff. There was also testimony that, when the gas was shut off, it was necessary to contact each customer of the area when the gas was shut off, and again when service was resumed. Prior to the strike, complaints of lack of gas were received by telephone at the service office, and thereafter repairmen were dispatched to the location. Repair crews were maintained on duty 24 hours to respond to complaints. Such crews could be dispatched from their homes, or, if in the field, by two-way radio. During the strike, low pressure areas were indicated on meters installed at the service office. Complaints and reports were also received at such office by telephone. Supervisory employees, if not in the field, were in turn called at their homes and dispatched to the scene.

During the hearing, the court, in admonishing counsel for plaintiff that he was consuming too much time with details, stated that the hearing was only upon an application for a restraining order.

At the conclusion of the evidence and concluding arguments of counsel, the court made the following statement, in part:

"The Court: First of all, the court wishes to state it has jurisdiction of the subject matter of both the original petition and the supplemental petition, being an exception to the general rule as carved out in the *Garner case,* it having to do with the equity powers of the court and the responsibility of the court to maintain law and order where there is any evidence that the picketing or the activities of the strike are a peril to the health and safety of the community.

"In this regard, I want to say that the picketing of private residences is untenable and in violation of the constitutional rights of all citizens, whether they belong to a union or not.

"There is no evidence in the record to show that these homes were used as an office of the gas company and therefore

a temporary restraining order will be issued forthwith restraining the union from picketing the homes of supervisory employees.

"* * *

"As to the original petition and restraining order, the court has under its general equity powers, even though as in this case, the employer has the right to go to NLRB in Washington and take advantage of the Act, still local courts have restraining power where there has been a question of violence. However, that does not mean the court must exercise that power, it means that under the facts and circumstances of each individual case, if the court feels it is necessary for the safety and welfare of the community, that this power should be exercised. It seems to me that the pickets have conducted themselves in an orderly manner. The police department have the matter in control and I can see no reason for a temporary restraining order as required in the petition, and therefore that temporary restraining order is denied.

"* * *

"The bond on the restraining order restraining the union from picketing the homes of any supervisory employee of the gas company will be set at $500."

The journal entry recited that the cause came on for hearing *only* on that part of the petition and supplemental petition asking for a temporary restraining order and "upon the petition, supplemental petition, the evidence and the law the court finds that it has jurisdiction of the subject matter." The court then found that the temporary restraining order sought in the petition should be and is denied. The court found further that a temporary restraining order should issue on the supplemental petition and restrained and enjoined, *until further order,* the defendants from picketing residences of the plaintiff's employees and from any acts of intimidation or threats of violence that would in any way interfere with the quiet enjoyment of their homes.

In specific terms, the injunctive order does not recite that it was issued *pendente lite,* but, construed in the light of the remarks of the court at the hearing and the provisions of Sections 2727.01 and 2727.02, Revised Code, as well as the language

employed in the order itself, it is to be regarded as a temporary restraining order *pendente lite.*

In determining whether a writ of prohibition shall issue, the court is governed by certain basic general principles. Construed in the light of the Ohio authorities, it is the most difficult of any of the extraordinary remedies, concerning which the Court of Appeals has original jurisdiction, to sustain. The writ is to be issued only in cases of extreme necessity, because of the absence or inadequacy of other remedies and only when the right is clear. *State, ex rel Merion, Supt.,* v. *Court of Common Pleas,* 137 Ohio St., 273; 44 Ohio Jurisprudence (2d), 177, Section 9. The writ should never issue in a doubtful or borderline case. *State, ex rel Merion, Supt.,* v. *Court of Common Pleas, supra; State, ex rel. Village of Kettering,* v. *Montgomery County Board of Elections,* 71 Ohio Law Abs., 550; *Reiss* v. *Municipal Court,* 76 Ohio Law Abs., 141, affirmed, 166 Ohio St., 178.

By an unbroken line of decisions, a writ of prohibition will not issue against a court having jurisdiction of the subject matter of an action pending before it to deprive such court of the authority vested in it by law to determine its own jurisdiction. 44 Ohio Jurisprudence (2d), 202, Section 24.

Aside from the provisions of Sections 7 and 8 of the National Labor Relations Act, the Common Pleas Court is vested with general jurisdiction over the subject matter of the petition for injunction. A majority of this court is of the opinion that inherent in the power of the court to determine its jurisdiction is also the power to preserve the status quo, *pendente lite,* by issuing a temporary restraining order or a temporary injunction pending final determination of the jurisdictional question. Cf. *State, ex rel. Winnefeld,* v. *Court of Common Pleas,* 159 Ohio St., 225, holding that a writ of prohibition will not be awarded to prevent an anticipated erroneous judgment, and reversing a judgment of the Court of Appeals granting a writ of prohibition. In *Ohio Contractors' Assn.* v. *Local 894,* 108 Ohio App., 395, a temporary restraining order was issued restraining picketing and for disobedience thereof the defendants were found guilty of contempt and fined. Upon appeal from the judgments in contempt, the gravamen of appellants' complaint

was that the trial court lacked jurisdiction by reason of the Taft-Hartley Act. In the opinion, after citing Sections 2727.03 and 2727.12, Revised Code, *United States* v. *Shipp,* 203 U. S., 563, *United States* v. *United Mine Workers of America,* 330 U. S., 258, and *Howat* v. *State,* 258 U. S., 181, the court said:

"Consonant with the foregoing authorities, which we believe to be completely dispositive of the questions here presented, we hold that, under the pleadings and under the Ohio statutes, the trial court, whether it ultimately determines that it has or does not have jurisdiction upon a consideration of the merits of the case, did have authority to issue the temporary restraining order and the temporary injunction; that it likewise had the power and legal authority to punish for contempt those parties who flagrantly flouted its order prior to a determination of the jurisdictional question upon a consideration of the case on its merits.

"We further hold that the question of jurisdiction of the subject matter of an action cannot be properly raised by an appellant, in an appeal from a contempt conviction arising from a violation of a temporary injunction, before the court from which the temporary injunction issued has had an opportunity to determine the question of its own jurisdiction by a final order of judgment. *Montgomery Bldg. & Construction Trades Council* v. *Ledbetter Erection Co., Inc.,* 344 U. S. 178, 97 L. Ed. 204, 73 S. Ct. 196."

For comment on the *Ledbetter case,* see below. See, also, *United States* v. *Shipp, supra* (203 U. S., 563), holding that the court and it alone had jurisdiction to decide whether the case was properly before it and until its judgment declining jurisdiction should be announced, it had authority from the necessity of the case to make orders to preserve the existing conditions and the subject of the petition. See, also, *In re Green,* Sixth Appellate District, unreported, decided Nov. 1, 1960.[1]

In the instant case, the petition below alleges, *inter alia,* that the defendants have engaged in picketing by violence, thus on its face removing the controversy from the exclusive jurisdiction of the National Labor Relations Board. The petition

---

1. Affirmed 172 Ohio St., 269, reversed 369 U. S., 689, 8 L. Ed. (2d), 198, 82 S. Ct., 1114.

prays that, pending final hearing and determination of the issues therein, a temporary restraining order be issued against the defendants from conducting certain specified activities, including the exercise of force, violence, intimidation and threats, and concludes with the usual prayer for a permanent injunction upon final hearing.

In the supplemental petition, the gas company incorporated the allegations of the petition and, after setting forth the picketing of residences of supervisory employees, prayed that, pending a final hearing, a restraining order be issued against the defendants from picketing before, or in the vicinity of, the residences of plaintiff's employees and from loitering or congregating at or near any approaches leading to such residences. To a majority of the court, it is apparent that the Common Pleas Court had jurisdiction to issue a restraining order or temporary injunction preserving the status quo pending final determination of the issues, including the question of jurisdiction.

As indicated above, a majority of this court construes the injunctive order as a temporary restraining order *pendente lite.*

Relator asserts in the petition that the order is not a final order from which an appeal may be had. We are inclined to agree with this assertion. *May Co.* v. *Bailey Co.,* 81 Ohio St., 471; *Tipling* v. *Randall Park Holding Co.,* 94 Ohio App., 505, citing authorities: *Tate* v. *Michael,* 98 Ohio App., 269. The same principle prevails in federal appellate review. *Montgomery Building & Construction Trades Council* v. *Ledbetter Erection Co., Inc.,* 344 U. S., 178, stating that the fact that as long as a temporary injunction is in force it may be as effective as a permanent injunction, and that appeals from interlocutory judgments have for that reason been authorized by state legislatures, and in some circumstances by Congress, do not give interlocutory judgments the aspect of finality required by Title 28 U. S. Code, Section 1257, and holding that the writ of certiorari had been improvidently granted.

Prohibition may not be invoked in a case where an adequate remedy by appellate review is available, and prohibition may not be invoked as a substitute for an appeal. Furthermore, it does not lie to prevent a subordinate court from deciding erroneously or from enforcing an erroneous judgment in a case in

which it has a right to adjudicate. *State, ex rel. Garrison,* v. *Brough,* 94 Ohio St., 115; *State, ex rel. Sparto,* v. *Juvenile Court,* 153 Ohio St., 64.

Even though the remedy of appeal is not presently available at the time the petition for a writ of prohibition is filed and determined, nevertheless the writ will not issue because prohibition is not available as a remedy to prevent an erroneous judgment. Thus, in the case of a petition for injunction to limit the number of pickets, wherein a demurrer on the ground that exclusive jurisdiction was vested in the National Labor Relations Board was overruled, there existed no final order from which an appeal could then be taken. Nevertheless, the Supreme Court sustained a demurrer to a petition in prohibition on the ground that the writ will not be awarded as a substitute for an appeal or to prevent an erroneous judgment. *State, ex rel. Central Stores Co.,* v. *Maiden, Judge,* 162 Ohio St., 167, citing *State, ex rel. Winnefeld,* v. *Court of Common Pleas, supra* (159 Ohio St., 225). Likewise, in *State, ex rel. City of Cleveland,* v. *Parma Municipal Court,* 163 Ohio St., 231, there was no final order of the Parma Municipal Court, but the writ was denied on the ground that the relator would not be irreparably harmed by waiting to pursue the remedy of appeal, citing *State, ex rel. Rhodes,* v. *Solether, Judge,* 162 Ohio St., 559. See, also, *State, ex rel. Estes,* v. *Marriott, Judge,* 170 Ohio St., 46; *Terrett* v. *Court of Appeals,* 170 Ohio St., 439. In the *Ledbetter Co. case, supra* (344 U. S., 178), at page 181, the Supreme Court of the United States states:

"It is argued that if this is not held to be a final decree or judgment and decided now, it may never be decided, because to await the outcome of the final hearing is to moot the question and frustrate the picketing. However appealing such argument may be, it does not warrant us in enlarging our jurisdiction. Only Congress may do that. Furthermore, the interlocutory decree could have been readily converted into a final decree, and the appeal could have proceeded without question as to jurisdiction just as effectively and expeditiously as the appeal from the interlocutory injunction was pursued in this case.

"Since there was no final judgment of the Supreme Court of Alabama for review, the writ of certiorari must be dismissed as improvidently granted."

In the instant case, it does not appear that a decision on the application for a permanent injunction will not be readily forthcoming following our decision in this case. From such an order, the remedy of appeal is available. Should such a decision be unduly delayed, procedendo would lie.

Furthermore, it is not at all certain that, under the decisions of the Supreme Court of the United States construing the provisions of Sections 7 and 8 of the National Labor Relations Act, the states have been deprived of jurisdiction to enjoin picketing of private homes. On several occasions, the Supreme Court has indicated that, notwithstanding the provisions of the Act, the state courts have jurisdiction over situations involving mass picketing, violence, intimidation of employees, obstructing streets and highways or picketing of homes.

In *Bakery & Pastry Drivers & Helpers Local* v. *Wohl* (1942), 315 U. S., 769, 775, the court states that a state is not required to tolerate in all places and under all circumstances even peaceful picketing by an individual. In *Allen-Bradley Local No. 1111* v. *Wisconsin Employment Relations Board* (1942), 315 U. S., 740, the Supreme Court upheld an order of the state labor board which enjoined, *inter alia,* mass picketing, threats of bodily injury and picketing of employees' homes.

In *Garner* v. *Teamsters Union* (1953), 346 U. S., 485, 488, after citing the *Allen-Bradley case, supra,* the following appears:

"Nor is this a case of mass picketing, threatening of employes, obstructing streets or highways, or picketing homes. We have held that the state may still exercise 'its historic powers over such traditional local matters as public safety and order and the use of streets and highways'."

In *United Automobile, Aircraft & Agriculture Implement Workers* v. *Wisconsin Employment Relations Board* (1956), 351 U. S., 266, the court affirmed a judgment of the Wisconsin Supreme Court affirming a cease and desist order of the state Employment Relations Board against the union and its members from coercing and intimidating any person desiring to be employed by the Kohler Company in the enjoyment of his legal rights, intimidating his family, picketing his domicile, or injuring the person or property of such person or his employer, not-

withstanding the employer was engaged in interstate commerce and that the National Labor Relations Board might have issued a similar complaint.

Picketing of private homes of nonstriking employees has been enjoined in the following state cases: *Pipe Machinery Co. v. DeMore* (1947), 49 Ohio Law Abs., 536; *Jacobs* v. *United Furniture Workers* (Cal. 1949), 16 Labor Cases, 65065; *Zeeman* v. *Amalgamated Employees Union* (Cal. 1950), 17 Labor Cases, 65572; *State* v. *Cooper* (Minn. 1939), 1 Labor Cases, 18374.

It is the contention of the plaintiffs that under the recent landmark decision in *San Diego Building Trades Council* v. *Garmon* (April 1959), 359 U. S., 236, the states are now deprived of all jurisdiction to enjoin peaceable picketing, including peaceful picketing of private homes. Plaintiffs further contend that under this decision but two areas have now been left to the states control: (1) Intimidation, threats of violence or violence and (2) when the activity regulated is merely of peripheral concern of the National Labor Relations Act. Arguments pro and con can be gleaned from the expressions employed in the opinion. For expressions appearing to exclude state jurisdiction, see dissenting opinion herein. On the other hand, the court, at page 243, also says:

"Administration is more than a means of regulation; administration is regulation. We have been concerned with conflict in its broadest sense; conflict with a complex and interrelated federal scheme of law, remedy, and administration. Thus judicial concern has necessarily focused on the nature of the activities which the states have sought to regulate, rather than on the method of regulation adopted. When the exercise of state power over a particular area of activity threatened interference with the clearly indicated policy of industrial relations, it has been judicially necessary to preclude the states from acting.[2] However, due regard for the presuppositions of our

2. Citing *Guss* v. *Utah Labor Relations Board*, 353 U. S., 1; *Youngdahl* v. *Rainfair*, 355 U. S., 131; *Teamsters Union* v. *New York, N. H. & H. R. Co.*, 350 U. S., 155; *Weber* v. *Anheuser-Busch, Inc.*, 348 U. S., 468; *Garner* v. *Teamsters Union*, 346 U. S., 485; *Automobile Workers* v. *O'Brien*, 339 U. S. 454; *Amalgamated Assn. of Street, Electric R. & Motor Coach Employees* v. *Wisconsin Board*, 340 U. S., 383; *Hill* v. *Florida*, 325 U. S., 538; *Teamsters Union* v. *Oliver*, 358 U. S., 283. The cases up to that time are summarized in *Weber* v. *Anheuser-Busch, Inc.*, 348 U. S., 468.

embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy, has required us not to find withdrawal from the states of power to regulate where the activity regulated was a merely peripheral concern of the Labor Management Relations' Act. See *International Assn. of Machinists* v. *Gonzales*, 356 U. S., 617. Or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the states of the power to act."[3]

The opinion also reiterates what was said in *Garner* v. *Teamsters Union, supra* (346 U. S., 485, 488), that the Labor Management Relations Act "leave much to the states, though Congress has refrained from telling us how much" and concludes that this penumbral area can be rendered progressively clear only by the course of litigation. See, also, *Weber* v. *Anheuser-Busch, Inc.,* 348 U. S., 468, 480.

The court also reiterates that "the statutory implications concerning what has been taken from the states and what has been left to them are of a Delphic nature, to be translated into concreteness by the process of litigating elucidation," citing *International Assn. of Machinists* v. *Gonzales,* 356 U. S., 617, 619.

For some twenty years, under the guise of construing the intent of Congress, the Supreme Court has embarked upon a course of judicial labor legislation, but has nevertheless refrained from prescribing with particularity the exact area of state versus National Labor Relations Board jurisdiction. Even in the case of *San Diego Building Trades Council* v. *Garmon,* 359 U. S., 236, the court has left the door open to the determination of questions of a Delphic nature to be translated into concreteness by the process of "litigation elucidation." Therefore, in the absence of a decision of the Supreme Court construing the Act as pre-empting jurisdiction over peaceful picketing of private homes, jurisdiction remains with the states. Conceding that it may be ultimately determined by the United

3. Citing *United Automobile Workers* v. *Russell,* 356 U. S., 634; *Youngdahl* v. *Rainfair,* 355 U. S., 131; *Auto Workers* v. *Wisconsin Board,* 351 U. S., 266; *United Construction Workers* v. *Laburnum Corp.,* 347 U. S., 656.

States Supreme Court that the state court has no jurisdiction, the Common Pleas Court in the instant case nevertheless has jurisdiction to determine the action, notwithstanding its decision may be erroneous. Except by way of review of decisions of the labor board, the process of litigation elucidation can be achieved only through review of such a state decision.

In the light of these observations, in the instant case it does not clearly appear that the Common Pleas Court has no jurisdiction of the cause which it is attempting to adjudicate, or necessarily that it is about to exceed its jurisdiction. *State, ex rel. Ellis,* v. *McCabe et al, Judges,* 138 Ohio St., 417; *State, ex rel. Clary,* v. *Probate Court,* 151 Ohio St., 497, 499, 500.

The writ is denied and the petition is dismissed.

*Writ denied.*

S<span style="font-variant:small-caps">MITH</span>, J., concurs.

D<span style="font-variant:small-caps">EEDS</span>, J., dissenting. The question presented for decision, is the authority and jurisdiction of the Court of Common Pleas in labor disputes affecting interstate commerce.

It is my view that the Supreme Court has determined that the National Labor Relations Board has the exclusive authority to decide as to whether peaceful picketing in a labor dispute involving interstate commerce is a fair or unfair labor practice

It is alleged by the relator union that a part of the work and business of the gas company was being performed by super visors at their places of residence. The evidence is clear that a part of the telephone communications and business of the gas company was being carried on at and from the residences of the gas company supervisors.

It is my opinion, therefore, that the question as to whether the picketing is a fair or an unfair labor practice is a question to be decided by the National Labor Relations Board, and no by the courts.

It is not disputed that the picketing of the residences of the supervisors was on account of and was a part of the labor dispute between the union and the Gas Company, involving interstate commerce.

It is my opinion that the decision of the United States Su

preme Court in *San Diego Building Trades Council* v. *Garmon,* 359 U. S., 236, controls the decision of this court in the action now before us. Paragraphs (a), (b), (c), (d) and (e) of the syllabus in that case are as follows:

"(a) When an activity is arguably subject to Section 7 or Section 8 of the National Labor Relations Act, as was the picketing here involved, the states as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board.

"(b) Failure of the National Labor Relations Board to assume jurisdiction does not leave the states free to regulate activities they would otherwise be precluded from regulating.

"(c) Since the National Labor Relations Board has not adjudicated the status of the conduct here involved, and since such activity is arguably within the compass of Section 7 or Section 8 of the Act, the state's jurisdiction is displaced.

"(d) A different conclusion is not required by the fact that all that is involved here is an attempt by the state to award damages, since state regulation can be as effectively exerted through an award of damages as through some form of preventive relief.

"(e) *United Automobile Workers* v. *Russell,* 356 U. S., 634, and *United Construction Workers* v. *Laburnum Corp.,* 347 U. S., 656, distinguished."

The pertinent allegations of the relator's petition are as follows:

"1. On January 21, 1961, The Ohio Fuel Gas Company, hereinafter called Ohio Fuel Gas or the Company, filed in the Common Pleas Court of Lucas County, Ohio, a petition for injunction in a cause docketed on the records of that court as No. 89833, (Appendix 1). Utility Workers Union of America, AFL-CIO, Local No. 349, hereinafter referred to as the Union, was named as principal defendant.

"2. On January 25, 1961, the Company filed in said Common Pleas Court cause of action a supplemental petition for injunction (Appendix 2).

"3. In said supplemental petition, the Company alleged, in substance, that certain of its supervisory employes, who are not members of the Union, have been assigned to operate and maintain its natural gas system, and 'that such supervisory em-

ployes in the course of such work are notified by telephone at their homes of the work that is required to be done, and of necessity, begin and end their transportation to and from such required work at their said homes,' (paragraph 4 on page 2 of the supplemental petition, emphasis supplied.)

"* * *

"5. The supplemental petition alleged that the Union had begun picketing the residences of its supervisory personnel and that such picketing 'is illegal, unlawful and intimidating to such employes and to their families, and constitutes an unlawful invasion of the rights of privacy of such employes,' " (paragraph 6 on page 3 of the supplemental petition).

"* * *

"7. Pursuant to order entered by defendant, the Honorable Geraldine Macelwane, on January 25, 1961, a hearing was held before the defendant on January 26, 1961, upon the prayer in both the petition and the supplemental petition for a temporary restraining order. The Union, by counsel, moved orally in said hearing that the temporary restraining order prayed for in the supplemental petition be denied on the ground that the court was without jurisdiction to issue such an order, and that the supplemental petition be dismissed on the ground that the court was without jurisdiction to entertain it. Counsel for the Union contended that the conduct of the Union complained of is subject only to such relief as the Company may be entitled to under the National Labor Relations Act, 29 U. S. C. Section 151; that such relief may be accorded only through the National Labor Relations Board, the jurisdiction of which the Company did not allege it had invoked; that the conduct of the Union at issue was either arguably protected or arguably prohibited by the National Labor Relations Act; and that a state could not apply to peaceful concerted activities of labor organizations designed to put economic pressure on the Company so as to outlaw such activities because of their alleged objective or effect upon the employes of the Company. The defendant overruled this oral motion of the Union.

"* * *

"10. The journal entry set forth above shows that Judge Macelwane has determined that she has jurisdiction to decide on the Company's supplemental petition whether the nor

violent conduct through which the Union is allegedly exerting economic pressure upon the Company is in fact and in law protected or prohibited by the national Act. Unless prohibited by this court from doing so, Judge Macelwane will undertake to hear and determine the factual issues raised by the supplemental petition concerning the Union's peaceful conduct on the prayer for a permanent injunction.

"11. In asserting jurisdiction to decide whether in fact or in law the alleged non-violent conduct of the Union is prohibited or protected by the national Act, Judge Macelwane has undertaken to exercise a jurisdiction withdrawn from state courts by the National Labor Relations Act and vested by that Act exclusively in the National Labor Relations Board. Similarly beyond Judge Macelwane's jurisdiction is her determination to test the legality of the alleged conduct complained of under Ohio's common law.

"* * * *

"12. The illegality of the exercise of jurisdiction by Judge Macelwane is particularly clear for:

"(1) The petition admits a labor dispute exists between the Company and the Union.

"(2) Counsel for the Company and the Union stipulated in the hearing that the picketing of the homes of supervisors was peaceful, occurred in the daytime only, and consisted of only one picket at a time. It was further stipulated that the homes of the two supervisors were picketed on January 25, 1961, and the homes of four supervisors were picketed on January 26, 1961.

"(3) A trial memorandum filed by counsel for the Company before the hearing on the temporary restraining order admitted the Company was 'engaged in interstate commerce or in an industry affecting interstate commerce and is subject to the Labor-Management Relations Act of 1947, as amended, which gives the National Labor Relations Board exclusive jurisdiction over some, but not all, aspects of management labor relation.' "

The answer of the respondent judge does not deny any of the allegations of the plaintiff's petition.

The relator, the Utility Workers Union, prays for the issuance of a writ of prohibition, prohibiting the judge of the

202

Court of Common Pleas from granting a permanent injunction, restraining the relator from peaceful picketing in the vicinity of the homes of the gas company supervisors.

The issue before this court is not whether the Court of Common Pleas has jurisdiction to grant an injunction against violence and intimidation, but rather, whether that court has jurisdiction to grant a permanent injunction against peaceful picketing in the vicinity of the residences of the supervisors of the gas company.

The evidence is that one member of the plaintiff union was engaged in picketing the residence of a supervisor during the period of time between 8 o'clock and 10 o'clock a. m. each day, and that the picketing was peaceful and without violence or threats of violence. It is not disputed that supervisors of the gas company operated company automobiles in the business of the gas company; that the supervisors parked the automobiles in their private residence garages; that equipment of the gas company, being used by the supervisors in performing work for the company, was carried in the company automobiles and was also kept in the automobiles while parked in the private garages of the supervisors. It is also not disputed that calls were received by the supervisors over radios maintained in company automobiles and private telephones of the supervisors, concerning work to be performed by the supervisors for the company while the strike was in progress; and that, prior to the strike, the company automobiles had been parked in the company garage and telephone communications were made at the service building of the company.

There was testimony in the Common Pleas Court that several telephone calls had been received at the home of a supervisor and that some of the calls were of an intimidating character. It seems entirely clear that the telephone calls made by unidentified persons at the residence of a supervisor can have no bearing on the question involved in this proceeding. There is no evidence as to the identity of the persons who made the calls, and there is no reason to believe that the same calls would not have been made if there had been no picketing in the vicinity of the residence of the supervisor. There is no evidence of any connection between the telephone calls and the peaceful picketing.

The Common Pleas Court has decided that it has jurisdiction to determine whether the peaceful picketing by the relator union should be permanently enjoined, as follows:

"Upon the petition, supplemental petition, the evidence and the law, the court finds that it has jurisdiction of the subject matter."

As stated in the petition in this court, counsel for the union entered an objection on the ground that the Court of Common Pleas was without jurisdiction to enjoin peaceful picketing, and that objection was overruled by the judge of that court, the respondent in the proceeding now before this court.

The respondent judge of the Court of Common Pleas has granted a temporary restraining order enjoining the relator from peaceful picketing in the vicinity of the residences of the supervisors of the gas company.

It is my opinion, in view of the decisions of the Supreme Court of the United States, that the relator is entitled to a writ of prohibition, prohibiting the judge of the Common Pleas Court from granting a permanent injunction against peaceful picketing by the relator union. 44 Ohio Jurisprudence (2d), Prohibition, Section 14.

The syllabus in the decision of the United States Supreme Court in *Guss* v. *Utah Labor Relations Board,* 353 U. S., 1, reads as follows:

"By vesting in the National Labor Relations Board jurisdiction over labor relations matters affecting interstate commerce, Congress has completely displaced state power to deal with such matters where the Board has declined to exercise its jurisdiction but has not ceded jurisdiction to a state agency pursuant to the proviso to Section 10(a) of the National Labor Relations Act.

"(a) By the National Labor Relations Act, Congress meant to reach to the full extent of its power under the Commerce Clause.

"(b) An agreement ceding jurisdiction to a state agency under Section 10(a) of the National Labor Relations Act is the exclusive means whereby states may be enabled to act concerning matters which Congress has entrusted to the National Labor Relations Board.

"(c) Not only was there a general intent on the part of

Congress to pre-empt the field of labor practices affecting interstate commerce, but also the proviso to Section 10(a) carries an inescapable implication of exclusiveness.

"(d) Since the power of Congress in the area of commerce among the states is plenary, its judgment in favor of uniformity must be respected, whatever policy objections there may be to the creation of a no-man's land in which labor disputes will not be regulated by any federal or state agency or court. 5 Utah (2d), 68, 296 P. (2d), 733, reversed."

Also see *Amalgamated Meat Cutters & Butcher Workmen of North America Local No. 427* v. *Fairlawn Meats, Inc.,* 353 U. S., 20.

It is my view, as stated above, that the later decision of the United States Supreme Court in *San Diego Building Trades Council* v. *Garmon, supra* (359 U. S., 236), is controlling in a decision in this proceeding. The reasons for the conclusion that the Court of Common Pleas does not have jurisdiction are clearly stated in the opinion in *San Diego Building Trades Council* v. *Garmon, supra,* at page 241, as follows:

"The case before us concerns one of the most teasing and frequently litigated areas of industrial relations, and multitude of activities regulated by Sections 7 and 8 of the National Labor Relations Act. 61 Stat., 140, 29 U. S. C., Sections 157, 158. These broad provisions govern both protected 'concerted activities' and unfair labor practices. They regulate the vital, economic instruments of the strike and the picket line, and impinge on the clash of the still unsettled claims between employers and labor unions. The extent to which the variegated laws of the several states are displaced by a single, uniform, national rule has been a matter of frequent and recurring concern. As we pointed out the other day, 'the statutory implications concerning what has been taken from the states and what has been left to them are of a Delphic nature, to be translated into concreteness by the process of litigating elucidation.' *International Assn. of Machinists* v. *Gonzales,* 356 U. S., 617, 619.

"In the area of regulation with which we are here concerned, the process thus described has contracted initial ambiguity and doubt and established guides for judgment by interested parties and certainly guides for decision. We state these principles in full realization that, in the course of a pro

cess of tentative, fragmentary illumination carried on over more than a decade during which the writers of opinion almost inevitably, because unconsciously, focus their primary attention on the facts of particular situations, language may have been used or views implied which do not completely harmonize with the clear pattern which the decisions have evolved. But it may safely be claimed that the basis and purport of a long series of adjudications have 'translated into concreteness' the consistently applied principles which decide this case.

"In determining the extent to which state regulation must yield to subordinating federal authority, we have been concerned with delimiting areas of potential conflict; potential conflict of rules of law, of remedy, and of administration. The nature of the judicial process precludes an *ad hoc* inquiry into the special problems of labor-management relations involved in a particular set of occurrences in order to ascertain the precise nature and degree of federal-state conflict there involved, and more particularly what exact mischief such a conflict would cause. Nor is it our business to attempt this. Such determinations inevitably depend upon judgments on the impact of these particular conflicts on the entire scheme of federal labor policy and administration. Our task is confined to dealing with classes of situations. To the National Labor Relations Board and to Congress must be left those precise and closely limited demarcations that can be adequately fashioned only by legislation and administration. We have necessarily been concerned with the potential conflict of two law-enforcing authorities, with the disharmonies inherent in two systems, one federal the other state, of inconsistent standards of substantive law and differing remedial schemes. But the unifying consideration of our decisions has been regard to the fact that Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience.

" 'Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for

investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies. * * * A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law.' *Garner* v. *Teamsters Union*, 346 U. S., 485, 490-491.

''Administration is more than a means of regulation; administration is regulation. We have been concerned with conflict in its broadest sense; conflict with a complex and interrelated federal scheme of law, remedy, and administration. Thus, judicial concern has necessarily focused on the nature of the activities which the states have sought to regulate, rather than on the method of regulation adopted. When the exercise of state power over a particular area of activity threatened interference with the clearly indicated policy of industrial relations, it has been judicially necessary to preclude the states from acting. However, due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy, has required us not to find withdrawal from the states of power to regulate where the activity regulated was a merely peripheral concern of the Labor Management Relations Act. See *International Assn. of Machinists* v. *Gonzales*, 356 U. S., 617. Or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the states of the power to act.

''*When it is clear or may fairly be assumed that the activities which a state purports to regulate are protected by Section 7 of the National Labor Relations Act, or constitute an unfair labor practice under Section 8, due regard for the federal enactment requires that state jurisdiction must yield.* To leave the states free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed

by state law. Nor has it mattered whether the states have acted through laws of broad general application rather than laws specifically directed towards the government of industrial relations. Regardless of the mode adopted, to allow the states to control conduct which is the subject of national regulation would create potential frustration of national purposes.

"At times it has not been clear whether the particular activity regulated by the states was governed by Section 7 or Section 8 or was, perhaps, outside both these sections. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance in the National Labor Relations Board. What is outside the scope of this court's authority cannot remain within a state's power and state jurisdiction too must yield to the exclusive primary competence of the Board. See, e. g., *Garner* v. *Teamsters Union*, 346 U. S., 485, especially at 489-491; *Weber* v. *Anheuser-Busch, Inc.*, 348 U. S., 468.

"The case before us is such a case. The adjudication in California has throughout been based on the assumption that the behaviour of the petitioning unions constituted an unfair labor practice. This conclusion was derived by the California courts from the facts as well as from their view of the Act. It is not for us to decide whether the National Labor Relations Board would have, or should have, decided these questions in the same manner. When an activity is arguably subject to Section 7 or Section 8 of the Act, the states as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.

"To require the states to yield to the primary jurisdiction of the National Board does not ensure Board adjudication of the status of a disputed activity. If the Board decides, subject to appropriate federal judicial review, that conduct is protected by Section 7, or prohibited by Section 8, then the matter is at an end, and the states are ousted of all jurisdiction. Or, the Board may decide that an activity is neither protected nor prohibited, and thereby raise the question whether such activity may be regulated by the states. However, the Board may fail to determine the status of the disputed conduct by declining to assert jurisdiction, or by refusal of the general counsel to file

a charge, or by adopting some other disposition which does not define the nature of the activity with unclouded legal significance. This was the basic problem underlying our decision in *Guss* v. *Utah Labor Relations Board*, 353 U. S., 1. In that case we held that the failure of the National Labor Relations Board to assume jurisdiction did not leave the states free to regulate activities they would otherwise be precluded from regulating. It follows that the failure of the Board to define the legal significance under the Act of a particular activity does not give the states power to act. In the absence of the Board's clear determination that an activity is neither protected nor prohibited or of compelling precedent applied to essentially undisputed facts, it is not for this court to decide whether such activities are subject to state jurisdiction. The withdrawal of this narrow area from possible state activity follows from our decisions in *Weber* and *Guss*. The governing consideration is that to allow the states to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy.

"In the light of these principles the case before us is clear. Since the National Labor Relations Board has not adjudicated the status of the conduct for which the state of California seeks to give a remedy in damages, and since such activity is arguably within the compass of Section 7 and Section 8 of the Act, the state's jurisdiction is displaced.

"*Nor is it significant that California asserted its power to give damages rather than to enjoin what the Board may restrain though it could not compensate.* Our concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered. Such regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy. Even the state's salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme. See *Garner* v. *Teamsters Union*, 346 U. S., 485, 492-497. It may be that an award of damages in a particular situation will not, in fact, conflict with the active assertion of federal

authority. The same may be true of the incidence of a particular state injunction. To sanction either involves a conflict with federal policy in that it involves allowing two law-making sources to govern. In fact, since remedies form an ingredient of any integrated scheme of regulation, to allow the state to grant a remedy here which has been withheld from the National Labor Relations Board only accentuates the danger of conflict.

"It is true that we have allowed the states to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order. *United Automobile Workers* v. *Russell*, 356 U. S., 634; *United Construction Workers* v. *Laburnum Corp.*, 347 U. S., 656. We have also allowed the states to enjoin such conduct. *Youngdahl* v. *Rainfair*, 355 U. S., 131; *Auto Workers* v. *Wisconsin Board*, 351 U. S., 266. State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly express congressional direction. We recognize that the opinion in *United Construction Workers* v. *Laburnum Corp.*, 347 U. S., 656, found support in the fact that the state remedy had no federal counterpart. But that decision was determined, as is demonstrated by the question to which the review was restricted, by the 'type of conduct' involved, *i. e.* 'intimidation and threats of violence.' In the present case there is no such compelling state interest." (Emphasis added.)

Since the peaceful picketing involved in the case before us is a part of a labor dispute affecting interstate commerce, it is clear that, whether such picketing is fair or not, fair labor practice is a question for the National Labor Relations Board, and, as clearly stated by the Supreme Court, it is not a question to be determined by the courts.

It is my conclusion that the Supreme Court decisions are to the effect that where Sections 7 and 8 of the National Labor Relations Act have application, as in the case at bar, the courts do not have jurisdiction to determine whether peaceful picketing does or does not constitute a fair labor practice and that such authority is within the exclusive jurisdiction of the National Labor Relations Board.

The decision of the majority of this court is to the effect

that the Court of Common Pleas should be allowed to grant a permanent injunction against "the peaceful picketing" in the vicinity of the residences of the supervisors, on the ground that the judge of that court is entitled to determine its jurisdiction by entering a final judgment in the cause. Many decisions are cited in support of that view. The writer does not believe that the cases cited are authority for that conclusion. It is uniformly held that prohibition is a preventive remedy and is for the purpose of preventing courts from finally acting where they do not have jurisdiction. The settled rule is stated in 44 Ohio Jurisprudence (2d), 226, Prohibition, Section 37, as follows:

"* * * Therefore, the earliest time at which the writ can be applied for with reasonable hope of success is immediately after the court, on its jurisdiction being challenged by objection or motion, overrules the objection, denies the motion, or otherwise expressly or by necessary implication announces its purpose to proceed. On the other hand, one who seeks a writ of prohibition must act before the issue becomes moot, inasmuch as prohibition is a preventive rather than a corrective remedy and will not lie to undo something which the inferior tribunal has fully consummated. So too, it has been held that the unexplained dilatoriness on the part of the relator, where his diligence was required and time was an important factor, will deprive him of relief in a prohibition action."

It is clear that the decision of this court should not be upon the ground that the Court of Common Pleas should be allowed to enter final judgment before petitioner is entitled to seek preventive relief.

If a litigant is required to allow the inferior court to render a final judgment before he can seek preventive relief, prohibition has lost its purpose as a remedy.

If the Court of Common Pleas is without jurisdiction, but, notwithstanding, is allowed to grant a permanent injunction against peaceful picketing, the relator can be required to appeal, and all relief may be deferred until a final determination by the Supreme Court of the United States.

The Supreme Court of this state has determined beyond any doubt that the remedy of prohibition is too late after the court has acted finally by entering a final judgment.

The decision of the Supreme Court in *State, ex rel. Mays-*

*ville Bridge Co.,* v. *Quinlan, Judge,* 124 Ohio St., 658, is determinative to the effect, that prohibition is the remedy before final judgment and not after the inferior tribunal has made a final decision. The opinion by the court in the *Maysville Bridge Co. case, supra,* is as follows:

"The court find that there is no warrant for the issuance of a writ of prohibition sought by the plaintiff, for the reason that the action, order and judgment which the plaintiff seeks to have restrained and prohibited have been fully consummated. A writ of prohibition may be awarded only to prevent the unlawful usurpation of jurisdiction, and does not lie to prevent the enforcement of a claimed erroneous judgment previously rendered; it may be invoked only to prevent proceeding in a matter in which there is an absence of jurisdiction and not to review the regularity of an act already performed. It cannot be substituted for a proceeding in error."

The following unequivocal pronouncements in the opinion in the decision by the United States Supreme Court in *San Diego Building Trades Council* v. *Garmon, supra,* are considered by the writer to be finally dispositive of the question (359 U. S., 242, 244):

" 'Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes towards labor controversies. * * * A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law.' * * *

"* * *

"At times it has not been clear whether the particular activity regulated by the states was governed by Section 7 or Section 8 or was, perhaps, outside both these sections. But

212

courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board. What is outside the scope of this court's authority cannot remain within a state's power and state jurisdiction too must yield to the exclusive primary competence of the Board.''

The Supreme Court has also determined that no distinction between public utilities and national manufacturing organizations is to be made in the administration of the federal Labor Act. *Consolidated Edison Co.* v. *National Labor Relations Board*, 305 U. S., 197; *Amalgamated Assn. of Employees* v. *Wisconsin Board* (1951), 340 U. S., 383.

It is my conclusion, therefore, that the respondent judge of the Common Pleas Court should be prohibited from granting a permanent injunction against peaceful picketing in the vicinity of the residences of the supervisors, and that the controversy on that question should be presented to the National Labor Relations Board, pursuant to the provisions of the National Labor Relations Act and the decisions of the United States Supreme Court.