[Civ. No. 43751. Second Dist., Div. Five. June 30, 1975.]

RICHARD T. HILL, Plaintiff and Respondent, v.
UNITED BROTHERHOOD OF CARPENTERS AND JOINERS
OF AMERICA, LOCAL 25 et al., Defendants and Appellants.

## COUNSEL

Geffner & Satzman, Howard Rosen and Leo Geffner for Defendants and Appellants.

Charles P. Scully, Donald C. Carroll, Van Bourg, Allen, Weinberg, Williams & Roger, Victor J. Van Bourg and David A. Rosenfeld as Amici Curiae on behalf of Defendants and Appellants.

Coleman, Silverstein & Hobart, G. Dana Hobart and Gerald Kane for Plaintiff and Respondent.

## OPINION

**LORING, J.**\*—Richard T. Hill (Hill) filed a first amended complaint for damages against United Brotherhood of Carpenters and Joiners of America, Local 25, an unincorporated association (Local 25), the Los Angeles County District Council of Carpenters, an unincorporated association (Council), United Brotherhood of Carpenters and Joiners of America, AFL-CIO,[1] an unincorporated association (United Brotherhood), Earl George Daley (Daley), Benjamin Fenwick (Fenwick), Joseph Wilk (Wilk), James Keene (Keene) and Kenneth Scott (Scott). The amended complaint contained four causes of action; the court sustained demurrers without leave to amend as to counts I, III and IV and overruled the demurrer to count II.[2] After answer, the case was tried by a jury. The court dismissed the action as to Keene. Hill voluntarily dismissed as to Scott and United Brotherhood. The jury returned a verdict in favor of Hill for $7,500 actual damages and $175,000 exemplary damages against Local 25, Council, and Daley and a verdict in favor of Fenwick and Wilk. Local 25, Council and Daley appeal from the judgment.

## CONTENTIONS

Appellants contend:

I. The superior court did not have jurisdiction where the alleged tort of intentionally inflicting emotional distress arose out of and as the result of alleged acts of discrimination in the hiring and dispatching policies and conduct by Local 25 inasmuch as that subject matter is preempted by the National Labor Relations Act.[3]

---

\*Assigned by the Chairman of the Judicial Council.

[1]We substitute the name under which the defendant appeared.

[2]Since Hill does not appeal from the judgment we will treat the legal problems as if only cause of action II had been filed.

[3]For sake of brevity and simplicity we have reworded and compressed appellants' argument into one sentence. As originally stated by appellant, this one point contains eight subdivisions and aggregates one and a half pages of headings. In addition, appellants (apparently out of an abundance of caution) urge eight additional grounds for reversal aggregating two and one-half additional pages of headings. These claims of alleged error relate to the conduct of the trial and the type of damages awarded. Since we conclude that the jurisdictional point is dispositive of this appeal and that reversal is mandated by federal law, we deem it inappropriate and unnecessary to attempt to match the scholarly effort of the parties and amicus curiae whose briefs aggregate almost 300 pages.

## FACTS

The amended complaint alleged: that Local 25 was an unincorporated association affiliated with Council and United Brotherhood "possessing and asserting jurisdiction over members of these organizations, that Local 25 is affiliated to the other organizations and is chartered by them and derives its power, duties and jurisdiction from each of them," that defendants "were and now are engaged in the business of being a labor union, or employees of a labor union," that each defendant was the "agent and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency and employment," that Hill was a member in good standing of each of the organizations. The critical paragraph (13) of the second cause of action reads:

"During the aforesaid period Defendants, and each of them, made repeated oral threats to Plaintiff to the effect that as long as they controlled the job-dispatching procedures that Plaintiff would be and he was given inferior assignments and be by-passed for work assignments. During the same period, as aforesaid, Defendants, and each of them, repeatedly threatened Plaintiff with actual or defacto expulsion from the union in retaliation for his political activities, and further threatened to deprieve [*sic*] Plaintiff of his ability to earn a living as a carpenter.

"Defendants, and each of them, knew or reasonably should have known or expected that their outrageous conduct, threats, intimidation, and words would result in severe emotional, mental and physical damage to Plaintiff."

The second cause of action further alleged that as a proximate result "of the intentional and wrongful *discriminatory conduct* practiced by Defendants and each of them as aforesaid Plaintiff has suffered a nervous breakdown, grievous mental anguish and bodily injury making him sick, sore and lame"; (italics ours) to his general damage in the sum of $500,000. The complaint also alleged "all of the aforesaid acts, conduct and *discrimination* by Defendants, and each of them was done deliberately and maliciously" (italics ours) for which Hill sought an additional $500,000 as punitive damages.

At trial, Hill produced evidence from which the jury could conclude that Daley was business agent of Local 25, that Daley dispatched

members of Local 25 to job sites on work assignments, that Hill was vice president of Local 25 during the period 1955-1968, that he had certain disputes and disagreements with Daley, that in January 1967, while he (Hill) was unemployed and on the out of work assignment list of Local 25, he was by-passed in assignment, that he complained to Daley and was told to go complain to Council, that he was a "jerk, knothead, idiot" and that he should go to another local union, that he had other disputes with Daley concerning a credit union established by Local 25 and expenses incurred by Daley, that Daley dispatched other carpenters to work assignments ahead of him and he complained to Daley on the dispatching procedures, that Daley told him he would sit on the bench until "hell freezes over." Hill testified that other Union officials (Wilk and Fenwick) treated him the same way, that he told Daley he would file with the National Labor Relations Board (N.L.R.B.). Hill produced evidence that certain job site employers requested that he (Hill) be assigned to their jobs, but Local 25 assigned other union members.

Hill testified that he filed charges with Council about Daley's dispatching procedures but that the executive board of Council dismissed the charges. Hill admitted that he was given some work assignments but he was also given other assignments where the work was nonexistent. On other assignments the type of work was unsatisfactory and he refused to accept it.

Hill testified that he ran for the office of President of Local 25 on the ground that Daley was a drunken fool, a disgrace to the union and corrupt and that he was discriminating in running the hiring hall. Hill testified that in 1967 he filed a charge with the N.L.R.B. on the Dinwiddie-Simpson construction job (Crocker Citizens Bank Building), alleging discriminatory assignment and that in November 1968, the N.L.R.B. found that there had been discrimination and the notice of discrimination from the N.L.R.B. which the N.L.R.B. required be posted "in a conspicuous place for 60 days" was buried by Daley on the window of one of the inner offices where nobody would see it.

Hill testified that he and Daley never engaged in any fight or struck any blows but that on one occasion Daley invited him to "go out in the street and fight." The invitation was apparently not accepted. Hill called Daley as an adverse witness and examined him at great length as to his work assignment practices.

Hill also produced evidence that Daley prevented him from performing his official duties as vice president of the union, that Daley would not let him preside in the absence of the president because Daley claimed that he (Hill) was inadequate, that Daley ridiculed him and insulted him before other union members, that Daley urged him to leave the union, that Daley threatened him, that Daley threatened to starve him by refusing work assignments, that Daley fabricated a dispatch slip in order to place Hill's name at the bottom of the out-of-work list from which assignments were made, that Daley interfered with his unemployment insurance benefits by telling the state agency that Hill had refused work assignments, that Daley would assign him to jobs which he was not qualified for and "just can't handle" which was contrary to union rules and regulations which allowed members to classify themselves regarding their work capabilities, that Daley refused to honor employers' specific requests for Hill, that he was threatened and intimidated because he filed charges with the N.L.R.B., that an agent of Council told 250 union members ". . . a brother ran down to the [N.L.R.B] and there's no brother going to extract money from this Union and stay in it," that Daley dispatched him to short jobs only—the Ruane job, 35 hours; the Burke job, 0 hours; the Weymouth-Crowell job, 2 days; the Spear job, 2 days—during which period there were 108 job opportunities on which other members were assigned, that Daley fabricated a dispatch of Hill to the Steel Form Company job which Hill allegedly refused, when in reality Hill received no such assignment. This was done in order to place Hill's name at the bottom of the job assignment list.

Hill claims that the totality of this evidence "constitutes an intentional infliction of severe emotional distress." Hill produced medical evidence regarding his alleged damages.

The defendants produced substantial evidence that employers did not request or want Hill on various jobs, that Hill had refused to work on various jobs, that Hill talked too much on the job, that he interfered with the work on various jobs, that Hill called Daley a drunken bum and then the two often drank and played poker together.

Wilk testified that he frequently drank with Hill and Daley, that he offered Hill various work assignments which Hill refused, that Hill called him a "dumb Polack" and would blow smoke in his face.

### DISCUSSION

■ Despite the multiplicity of arguments for reversal presented by appellants, we conclude, as indicated, that one argument is basic and controlling—that the federal government has preempted this field and the state courts have no jurisdiction, that jurisdiction to right the alleged wrong is vested in the N.L.R.B. We regard four cases as controlling—*San Diego Unions* v. *Garmon,* 359 U.S. 236 [3 L.Ed.2d 775, 79 S.Ct. 773]; *Plumbers' Union* v. *Borden,* 373 U.S. 690 [10 L.Ed.2d 638, 83 S.Ct. 1423]; *Iron Workers* v. *Perko,* 373 U.S. 701 [10 L.Ed.2d 646, 83 S.Ct. 1429]; and *Motor Coach Employees* v. *Lockridge,* 403 U.S. 274 [29 L.Ed.2d 473, 91 S.Ct. 1909].

In *San Diego Unions* v. *Garmon, supra,* the Supreme Court reversed a judgment of a state court awarding damages against a labor union allegedly sustained as the result of picketing by a labor union in the course of a labor dispute. In reversing judgment the Supreme Court said (at pp. 244-245 [3 L.Ed.2d at pp. 782-783]):

"When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law. Nor has it mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations. [Fn. omitted.] Regardless of the mode adopted, to allow the States to control which is the subject of national regulation would create potential frustration of national purposes.

"At times it has not been clear whether the particular activity regulated by the States was governed by § 7 or § 8 or was, perhaps, outside both these sections. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board. What is outside the scope of this Court's authority cannot remain within a State's power and state jurisdiction too must

yield to the exclusive primary competence of the Board. See, *e.g., Garner* v. *Teamsters Union,* 346 U.S. 485, especially at 489-491 [98 L.Ed. 228, 238-240, 74 S.Ct. 161]; *Weber* v. *Anheuser-Busch, Inc.* 348 U.S. 468 [99 L.Ed. 546, 75 S.Ct. 480].

"The case before us is such a case. The adjudication in California has throughout been based on the assumption that the behavior of the petitioning unions constituted an unfair labor practice. This conclusion was derived by the California courts from the facts as well as from their view of the Act. It is not for us to decide whether the National Labor Relations Board would have, or should have, decided these questions in the same manner. When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *(Ibid.)*

"To require the States to yield to the primary jurisdiction of the National Board does not ensure Board adjudication of the status of a disputed activity. If the Board decides, subject to appropriate federal judicial review, that conduct is protected by § 7, or prohibited by § 8, then the matter is at an end, and the States are ousted of all jurisdiction. . . ."

In *Garmon* the N.L.R.B. had declined jurisdiction.

In *Plumbers' Union* v. *Borden, supra,* Borden, a member of a Louisiana Local Plumbers' Union, attempted to secure a job with the Farwell Construction Company in Dallas, Texas. The business agent of the Dallas local refused to assign Borden to the job even though the foreman on the job had requested Borden. The business agent of the Dallas local refused to assign Borden apparently because Borden had procured the job himself and "he shoved his [Union] card down our throat." Borden filed an action for damages in the Texas state courts, alleging that the actions of the defendants "constituted a wilful, malicious and *discriminatory* interference with his right to contract." (Italics ours.) Plumbers' Union Local 100 challenged the jurisdiction of the state courts, alleging that the N.L.R.B. had exclusive jurisdiction. The trial court upheld the claim but the Texas Court of Civil Appeals reversed and remanded for trial. The Texas Supreme Court affirmed the remand on another point. On trial the jury made an award of $1,916 for actual damages, $1,500 for

"mental suffering and $5000 for punitive damages." The trial court disallowed the award for mental suffering and remitted punitive damages in excess of $1,916—the amount of the actual damages as found by the jury. The Texas Court of Civil Appeals affirmed and the Supreme Court of Texas denied a writ of error. The United States Supreme Court granted certiorari and reversed. The United States Supreme Court said in part (at pp. 693-696 [10 L.Ed.2d at pp. 641-643]):

"This Court held in *San Diego Bldg. Trades Council* v. *Garmon,* 359 U.S. 236 [3 L.Ed.2d 775, 79 S.Ct. 236], that in the absence of an overriding state interest such as that involved in the maintenance of domestic peace, state courts must defer to the exclusive competence of the National Labor Relations Board in cases in which the activity that is the subject matter of the litigation is arguably subject to the protections of § 7 or the prohibitions of § 8 of the National Labor Relations Act. [Fn. omitted.] This relinquishment of state jurisdiction, the Court stated, is essential 'if the danger of state interference with national policy is to be averted.' 359 U.S., at 245, and is as necessary in a suit for damages as in a suit seeking equitable relief. *Thus the first inquiry, in any case in which a claim of federal preemption is raised, must be whether the conduct called into question may reasonably be asserted to be subject to Labor Board cognizance.* [Italics ours.]

"In the present case, respondent contends that no such assertion can be made, but we disagree. [Fn. omitted.] The facts as alleged in the complaint, and as found by the jury, are that the Dallas union business agent, with the ultimate approval of the local union itself, refused to refer the respondent to a particular job for which he had been sought, and that this refusal resulted in an inability to obtain the employment. Notwithstanding the state court's contrary view, if it is assumed that the refusal *and the resulting inability to obtain employment* were in some way based on respondent's actual or believed failure to comply with internal union rules, it is certainly "arguable" that the union's conduct violated § 8 (b) (1) (A), by restraining or coercing Borden in the exercise of his protected right to refrain from observing those rules, and § 8 (b) (2), by causing an employer to discriminate against Borden in violation of § 8 (a) (3) . . . .

"It may also be reasonably contended that after inquiry into the facts, the Board might have found that the union conduct in question was not an unfair labor practice but rather was protected concerted activity

within the meaning of § 7. This Court has held that hiring-hall practices do not necessarily violate the provisions of federal law, *Teamsters Local v. Labor Board,* 365 U.S. 667 [6 L.Ed.2d 11, 81 S.Ct. 835], and the Board's appraisal of the conflicting testimony might have led it to conclude that the refusal to refer was due only to the respondent's efforts to circumvent a lawful hiring-hall arrangement rather than to *his* engaging in protected activities. The problems inherent in the operation of union hiring halls are difficult and complex, see Rothman, The Development and Current Status of the Law Pertaining to Hiring Hall Arrangements, 48 Va.L.Rev. 871, and point up the importance of limiting initial competence to adjudicate such matters to a single expert federal agency.

"We need not and should not now consider whether the petitioner's activity in this case was federally protected or prohibited, on any of the theories suggested above or on some different basis. [Fn. omitted.] *It is sufficient for present purposes to find, as we do, that it is reasonably 'arguable' that the matter comes within the Board's jurisdiction.*" (Italics ours.)

The court then distinguished *Machinists v. Gonzales,* 356 U.S. 617 [2 L.Ed.2d 1018, 78 S.Ct. 923], which involved a state action for restoration to union membership where there had been an allegedly unlawful expulsion. The court then said (at pp. 697-698 [10 L.Ed.2d at pp. 643-644]):

"*The suit involved here was focused principally, if not entirely, on the union's actions with respect to Borden's efforts to obtain employment.* No specific equitable relief was sought directed to Borden's status in the union, and thus there was no state remedy to 'fill out' by permitting the award of consequential damages. *The 'crux' of the action (Gonzales,* 356 U.S., at 618) *concerned Borden's employment relations and involved conduct arguably subject to the Board's jurisdiction.*

"*Nor do we regard it as significant that Borden's complaint against the union sounded in contract as well as in tort. It is not the label affixed to the cause of action under state law that controls the determination of the relationship between state and federal jurisdiction.* Rather, as stated in *Garmon, supra,* at 246, '[o]ur concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered.' (Emphasis added.)

"In the present case the *conduct* on which the suit is centered, whether described in terms of tort or contract, is conduct whose lawfulness could initially be judged only by the federal agency vested with exclusive primary jurisdiction to apply federal standards." (Italics ours.)

In *Iron Workers Union* v. *Perko* (decided on the same date), *supra,* Perko (a union member) sued the union and certain of its officials at common law in Ohio state courts, seeking damages because the defendants had allegedly entered into a conspiracy to deprive Perko of his right to work as a foreman. Perko alleged that defendants had induced employees to discharge Perko and that defendants had prevented him from obtaining work. The trial court dismissed and the Ohio Supreme Court reversed. The United States Supreme Court said that the Ohio Supreme Court said: " 'Plaintiff is not attempting to secure any redress for loss of rights as a member of the union. . . . He is alleging that the union to which he belonged and certain named officials thereof committed *a common-law tort against him by conspiring to deprive him of his right to earn a living and interfering with his contract of employment. . . .* ' " (Italics ours.)

The Supreme Court of the United States also characterized the decision of the Ohio Supreme Court as follows (at p. 703 [10 L.Ed.2d at p. 648]): "In answer to the union's argument that federal law precluded the exercise of state jurisdiction, the court stated that there was no federal preemption with regard to a state action 'to recover damages for a common-law tort, which is also an unfair labor practice,' citing *International Assn. of Machinists* v. *Gonzales,* 356 U.S. 617 [2 L.Ed.2d 1018, 78 S.Ct. 923]."

The case was tried. The trial court instructed the jury to return a verdict for the defendants which was reversed on appeal by the Ohio courts and the case was finally retried by a jury resulting in a verdict for $25,000 for Perko which was affirmed by the Ohio Court of Appeals. The United States Supreme Court granted certiorari to consider the defendant's claim that the state courts lacked jurisdiction by virtue of the National Labor Relations Act. The United States Supreme Court said: "As in *Borden,* the crux of the action here concerned alleged interference with the plaintiff's existing or prospective employment relations and was not directed to internal union matters. Indeed the state court itself observed that 'Plaintiff is not attempting to secure any redress for loss of rights as a member of the union.' *Supra,* p. 703. Thus there was no

permissible state remedy to which the award of consequential damages for loss of earnings might be subordinated."

The United States Supreme Court then considered the question whether or not the fact that Perko was a "foreman" compelled a result different from *Borden.* Among other elements the court concluded that Perko might still be considered by the N.L.R.B. as an employee (not as a supervisor) and even if he was a supervisor the union could be guilty of an unfair labor practice against a supervisor. The Supreme Court concluded:

"We do not of course intimate any view on the merits of any of the underlying substantive questions, that is, whether the union was guilty of a violation of the Act. It is enough to hold, as we do, that it is plain on a number of scores that the subject matter of this lawsuit 'arguably' comes within the Board's jurisdiction to deal with unfair labor practices. We therefore conclude that the State must yield jurisdiction and the judgment below must be

*Reversed."*

■ We conclude from the foregoing that if the union conduct complained of " 'arguably' comes within the Board's [N.L.R.B.] jurisdiction to deal with unfair labor practices" then state jurisdiction is preempted and the N.L.R.B. has exclusive jurisdiction.

■ An additional and later case which supports this conclusion is *Motor Coach Employees* v. *Lockridge, supra,* wherein Lockridge recovered damages in a state court (Idaho) action for allegedly wrongful expulsion from a union and consequent denial of work for alleged nonpayment of union dues. Lockridge alleged that the defendants " 'acted wantonly, wilfully and wrongfully and without just cause . . . and plaintiff has been harassed and subject to *mental anguish.*' " (Italics ours.) The United States Supreme Court granted certiorari. It characterized the *Garmon* case as follows:

"*San Diego Building Trades Council* v. *Garmon,* 359 U.S. 236 [3 L.Ed.2d 775, 79 S.Ct. 773] (1959), established the general principle that the National Labor Relations Act pre-empts state and federal court jurisdiction to remedy conduct that is arguably protected or prohibited by the Act. That decision represents the watershed in this Court's

continuing effort to mark the extent to which the maintenance of a general federal law of labor relations combined with a centralized administrative agency to implement its provisions necessarily supplants the operation of the more traditional legal processes in this field. We granted certiorari in this case, 397 U.S. 1006 [25 L.Ed.2d 419, 90 S.Ct. 1232] (1970), because the divided decision of the Idaho Supreme Court demonstrated the need for this Court to provide a fuller explication of the premises upon which *Garmon* rests *and to consider the extent to which that decision must be taken to have modified or superseded this Court's earlier efforts to treat with the knotty pre-emption problem.*" (Italics ours.) (At pp. 276-277 [29 L.Ed.2d at p. 477].)

The Supreme Court referred to section 8 of the National Labor Relations Act and various subdivisions thereof which make it an unfair labor practice to encourage or discourage union membership. The court said: "Further, in *San Diego Building Trades Council* v. *Garmon,* 359 U.S., at 245 [3 L.Ed.2d at p. 783], we held that the National Labor Relations Act pre-empts the jurisdiction of state and federal courts to regulate conduct 'arguably subject to § 7 or § 8 of the Act.' On their face, the above-quoted provisions of the Act at least arguably either permit or forbid the union conduct dealt with by the judgment below. For the evident thrust of this aspect of the federal statutory scheme is to permit the enforcement of union security clauses, by dismissal from employment, only for failure to pay dues. Whatever other sanctions may be employed to exact compliance with those internal union rules unrelated to dues payment, the Act seems generally to exclude dismissal from employment." (At p. 284 [29 L.Ed.2d at p. 481].)

The Supreme Court alluded to the fact that the Idaho Supreme Court in affirming the Idaho judgment for damages attempted to base the decision on Idaho contract law. The court concluded that that was not a sufficient basis to nullify the preemption doctrine. The court reviewed its efforts to find a basis for sustaining state action, one of which was "on whether the States purported to apply a remedy not provided for by the federal scheme, *e.g., Weber* v. *Anheuser-Busch, Inc.,* 348 U.S. 468, 479-480, . . ." The court then concluded:

"The failure of alternative analyses and the interplay of the foregoing policy considerations, then, led this Court to hold in *Garmon,* 359 U.S., at 244 [3 L.Ed.2d at p. 782]:

" 'When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law.' " (At p. 291 [29 L.Ed.2d at p. 485].)

It is true that in the case at bar Hill complained of incidental conduct which might not directly involve his employment, such as the fact that Daley used abusive language, called Hill foul names and that Daley invited him outside on one occasion for a fight. Also that Daley advised the state unemployment insurance people that Hill had refused work assignments and was therefore not eligible for unemployment benefits. It is undoubtedly true that there was bitter animosity between the two men which was reflected in a variety of ways. However, we think the words of the United States Supreme Court in *Borden, supra,* are controlling. To paraphrase: "The 'crux' of the action (*Gonzales,* 356 U.S. at 618) concerned [Hill's] employment relations and involved conduct arguably subject to the Board's jurisdiction."

". . . 'Our concern is with delimiting *areas of conduct* which must be free from state regulation if national policy is to be left unhampered.' (Emphasis added.) [4] [¶] In the present case the *conduct* [5] on which the suit is centered, whether described in terms of tort or contract, is conduct whose lawfulness could initially be judged only by the federal agency vested with exclusive primary jurisdiction to apply federal standards." In the case at bar the "crux" of the action concerned Hill's employment. The "crux" of the action was arguably subject to Board's jurisdiction. The *conduct* on which the suit is *"centered"* is conduct which is within the Board's exclusive primary jurisdiction to apply federal standards.

In the case at bar the trial court committed the same error which was committed by the Supreme Court of Ohio in *Perko*. The trial court here and the Supreme Court of Ohio there concluded that the federal preemption doctrine did not apply to a state action " 'to recover damages for a common law tort, which is also an unfair labor practice.' " The

---

[4]Italics added by United States Supreme Court.
[5]Italics added by United States Supreme Court.

common law tort to which the Ohio Supreme Court referred was that " 'certain named officials thereof [of the local union] committed a common-law tort against him [Perko] by conspiring to deprive him of his right to earn a living and interfering with his contract of employment.' " The United States Supreme Court held that the Ohio Supreme Court was in error because "the *crux* of the action here concerned alleged interference with the plaintiff's existing or prospective employment relations." (Italics ours.)

The fact that in the case at bar Hill sought damages for mental anguish should not change the result here any more than such a claim for mental anguish changed the result in *Borden, supra* and *Lockridge, supra*. It is the "crux" of the cause of action, the "conduct" which is complained of which controls whether federal or state courts have jurisdiction, not the type of damage which is caused by such conduct.

In the case at bar we are not required to speculate whether or not the wrongs which Hill complains of were "arguably" within the jurisdiction of the N.L.R.B. Here the N.L.R.B. did in fact assume jurisdiction, it did find that Local 25 was guilty of unfair labor practices in making work assignments of Hill in the Dinwiddie-Simpson job for the construction of the "Crocker Citizens Bank" building and awarded Hill $2,517 back wages for discriminating conduct with reference to that job. Hill filed other charges of unfair labor practices with the N.L.R.B. but voluntarily withdrew them.

We presume that the N.L.R.B. would have correctly decided the additional matters and would have granted the relief, if any, to which Hill was legally entitled if Hill had pursued the matter further before the N.L.R.B. But Hill was apparently dissatisfied with the award of $2,517 from the N.L.R.B. and sought the more generous bounties of a common law jury. Such an approach might have been permissible under *Weber* v. *Anheuser-Busch, Inc., supra,* but that concept was repudiated by *Iron Workers* v. *Perko, supra,* wherein the United States Supreme Court said if the union conduct is "arguably" within the jurisdiction of the N.L.R.B., state jurisdiction is preempted even though state jurisdiction may award greater relief than would be awarded by the N.L.R.B.

Here there is no doubt in our view that the "crux" of the conduct of the defendants complained of by Hill related directly or indirectly to his employment and work assignments. The key allegation of his complaint

was that the defendants "made repeated oral threats to the effect that as long as they controlled job dispatching procedures that [Hill] would be *and he was given* inferior assignments and be bypassed for work assignments." (Italics ours.) That he was threatened with actual and de facto expulsion in "retaliation for his political activities" and defendants "further threatened to deprive [Hill] of his ability to earn a living as a carpenter." That "as a proximate result of the intentional and wrongful *discriminatory conduct*" (italics ours) Hill suffered certain damages.

We are unable to distinguish the case at bar from *Plumbers' Union* v. *Borden, supra, Iron Workers* v. *Perko, supra,* and *Motor Coach Employees* v. *Lockridge, supra.*

Hill contends that this is an action at common law for damages for intentional infliction of emotional distress. But in *Borden, supra,* the United States Supreme Court said that it is not significant that the complaint "sounded in contract as well as in tort." The court also said: "It is not the label affixed to the cause of action under state law that controls the determination of the relationship between state and federal jurisdiction. Rather as stated in *Garmon, supra,* at 246, '[o]ur concern is with the delimiting *areas of conduct* which must be free from state regulation if national policy is to be left unhampered.' (Emphasis added.)" (At p. 698 [10 L.Ed.2d at p. 644].)

In both *Borden* and *Lockridge* the plaintiff sought damages for emotional and mental distress. As we have already stated, in each instance the United States Supreme Court in effect held that that was not determinative, that the determinative factor was the "areas of conduct" not the type of damage that is inflicted as a proximate result of the conduct. The very purpose of having one uniform national policy administered by a single specially constituted tribunal would be completely frustrated and defeated if it were legally permissible for juries in the 50 different state tribunals to award different amounts of damage for conduct which is essentially within the jurisdiction of the N.L.R.B. A labor union could be completely wiped out financially by such awards resulting in substantial detriment to other innocent union members whose livelihood depends upon continued union representation. A collusive action with such a result is not beyond the realm of possibility. If the award of damages by the N.L.R.B. is inadequate for any reason, the remedy lies with the federal government, not by resort to the tribunals of the 50 different states. Hill seeks to distinguish *Borden,*

*supra,* and *Perko, supra,* on the ground that each case involved a single act of unfair labor practice rather than a course of conduct which is what is involved in the case at bar. We regard this as a difference without legally significant distinction. We are cited to no authority that holds that N.L.R.B. jurisdiction is limited to single acts of unfair labor practice and that it has no jurisdiction of a course of conduct.

For purposes of illustration only we note that under section 187 of the Labor Management Act (29 U.S.C.A. [29 U.S.C.S. § 187].) Congress did expressly reserve to the injured party causes of action for damages in United States District Courts "or in any other court having jurisdiction of the parties" resulting from an unfair labor practice under section 158 (b) (4) (secondary boycotts). If the Congress had intended to allow the 50 different states power to award damages for the type of action arising out of the unfair labor practices alleged in the case at bar, it would have been an extremely simple matter to enlarge the provision of section 187 to encompass such actions.

What we have said is not in conflict with *Alcorn* v. *Anbro Engineering, Inc.,* 2 Cal.3d 493 [86 Cal.Rptr. 88, 468 P.2d 216], which is relied on by Hill. There Alcorn was expelled from a union solely on racial grounds. The court held that he had a cause of action for damages for intentionally inflicting emotional distress. The California Supreme Court did not discuss the preemption doctrine. No one raised that point presumably because the case related to union membership rather than unfair labor practices in the course of actual employment. In *Machinists* v. *Gonzales,* the United States Supreme Court recognized that the expulsion of a member from a union related to purely internal union matters and did not relate to employment or discriminatory practices which constituted unfair labor practices within the arguable jurisdiction of the N.L.R.B. An action for damages for expulsion from a union was then recognized as an exception to the preemption doctrine and such an action could be maintained in a state tribunal. *Alcorn* v. *Anbro Engineering Inc.* comes within this exception. That case, unlike this case, may well involve constitutional questions. The case at bar, unlike *Shaw* v. *Metro-Goldwyn-Mayer, Inc.,* 37 Cal.App.3d 587 [113 Cal.Rptr. 617]; *Magallanes* v. *Local 300, Laborers' Internat. Union of North America,* 40 Cal.App.3d 809 [115 Cal.Rptr. 428] and *Breitegger* v. *Columbia Broadcasting System, Inc.,* 43 Cal.App.3d 283 [117 Cal.Rptr. 699], is not an action under section 301 of the National Labor Relations Act (29 U.S.C.A. [29 U.S.C.S. § 301]) to recover damages or otherwise enforce a

collective bargaining agreement. Such an action is expressly permitted by federal law and the state and federal courts are given concurrent jurisdiction of such an action by federal law. Although the complaint in the case at bar makes casual reference to threatened union expulsion, it is clear that no expulsion in fact occurred and that the primary thrust of the complaint and the evidence (the "crux" of the case) arguably constituted unfair labor practices. The case at bar, therefore, is within the general rule and the cause of action here is preempted by federal policy.

We conclude that the trial court herein was without jurisdiction and that jurisdiction was vested in the N.L.R.B.

The judgment is reversed, with instructions to render judgment for the defendants and dismiss the action.

Stephens, Acting P. J., and Hastings, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied September 10, 1975.